# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GOULD ELECTRONICS INC., an Arizona
corporation,

           Plaintiff,

-vs-

LIVINGSTON COUNTY ROAD
COMMISSION, a Michigan road commission,

           Defendant.

-and-

LIVINGSTON COUNTY ROAD COMMISSION,

           Counter-Plaintiff,

-vs-

GOULD ELECTRONICS INC., an Arizona
corporation,

           Counter-Defendant.

Case No. 4:09-cv-12633-MAG-VMM
Hon. Mark A. Goldsmith
Magistrate Michael J. Hluchaniuk

---

## JOINT FINAL PRETRIAL ORDER

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1220   Filed 05/14/19   Page 3 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 3 of 52   Pg ID 547
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 5 of 137   Pg ID 3340

III.   <u>Settlement</u>:   The parties have conferred and consider the possibility of settlement, most recently pursuant to a facilitation before Phil Grashoff on April 24 and 25, 2012. The facilitation did not result in a settlement, and the parties currently do not have any plans for further settlement discussions at this time.

IV.   <u>Statement of Claims and Defenses</u>:

A.   Plaintiff's Claims.

Gould: 1.   <u>Count I – Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") claim pursuant to 42 U.S.C. §9607(a)</u>

Gould: a)   <u>*Basic Elements of Count I*</u>

Gould: "Recovery of response costs by a private party under CERCLA is a two-step process. Initially, a plaintiff must prove that the defendant is liable under CERCLA. Once that is accomplished, the defendant's share of liability is apportioned in an equitable manner." <u>Kalamazoo River Study Group v. Menasha Corp.</u>, 228 F.3d 648, 656-657 (6th Cir. 2000) (citation omitted).

Gould: "In order to establish a prima facie case for cost recovery under §107(a), a plaintiff must prove four elements: (1) the site is a "facility"; (2) a release or threatened release of a hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response'; and (4) the defendant falls within one of the four categories of [potentially responsible parties]." <u>Id.</u> at 653 (citation omitted).

Gould:   (1)   <u>The property at issue is a "facility"</u>

Gould:   42 U.S.C. §9601(9) defines a "facility" for purposes of CERCLA. "The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. §9601(9).

Gould:   "The expansiveness of this definition is well recognized." <u>Northwestern Mutual Life Insurance Co. v. Atlantic Research Corp.</u>, 847 F. Supp 389, 395 (E.D. Va. 1994). "The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination." <u>United States v. Township of Brighton</u>, 153 F.3d 307, 313 (6th Cir. 1998). "However, an area that cannot be reasonably or naturally divided into multiple parts or functional

2

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1221   Filed 05/14/19   Page 4 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 4 of 52   Pg ID 548
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 6 of 137   Pg ID 3341

units should be defined as a single 'facility,' even if it contains parts that are non-contaminated." Id.

Gould: "[C]ourts have consistently rejected attempts to create unnatural boundaries between different "facilities" based on legal ownership boundaries." Clear Lake Props. v. Rockwell Int'l Corp., 959 F. Supp. 763, 768 (S.D. Tex. 1997) (Defendant, as a PRP could not bring a §107 cost recovery action against the third party neighbor, but could bring a contribution action under §113.)

### *Plaintiff's Supporting Facts[1]*

Gould: (a)  The LCRC Property is a site where TCE, a hazardous substance, has been deposited, stored, disposed of, placed, or otherwise come to be located.

Gould: (b)  Defendant acknowledges that the LCRC Property is contaminated with TCE. (See, e.g., LCRC's Amended Counter-Complaint and Third-Party Complaint, ¶18).

Gould: (c)  The MDEQ has declared the LCRC Property is a "facility" pursuant to Michigan's analogous definition of "facility" in Michigan's environmental statute, the National Resources and Environmental Protection Act ("NREPA"), Mich. Comp. Laws Ann. §324.20101(r).

Gould: (d)  The LCRC Property was defined as a "facility" in the Environmental Site Assessment Livingston County obtained before purchasing the property. (See Parker Dep. Ex. 102).

Gould: (e)  Defendant admits that it owned and operated a facility located at 918 North Street, Howell, Michigan immediately adjacent to the Former Gould Property (the "Road Commission Property")." (See, LCRC's Amended Counter-Complaint and Third-Party Complaint, ¶16).

### Contested by LCRC:

LCRC: 1.  LCRC contests Gould's suggestion that the area of TCE contamination should be treated as a single "facility." This is a case where TCE contamination from the Gould property has migrated onto the LCRC property. In a case such as this involving the migration of contamination onto another site, the Sixth Circuit has clearly stated that the plaintiff has the burden of proof to establish a causal

---

[1] Although it is not feasible to include every fact supporting Plaintiff's claims in this Pretrial Order, Plaintiff has made a good faith effort to include some of the most salient facts and in the Plaintiff's Defenses section below. The inclusion of certain facts is in no way intended to exclude omitted facts.

3

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1222   Filed 05/14/19   Page 5 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 5 of 52   Pg ID 549
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 7 of 137   Pg ID 3342

connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999). Furthermore, LCRC has a complete defense to Gould's CERCLA cost recovery claim as the owner of contiguous property that has been contaminated by hazardous substances from the property owned by Gould. 42 U.S.C. 9607(q).

LCRC: 2.    LCRC contests Gould's suggestion that LCRC is strictly liable by the virtue of the presence of TCE on its property. Because TCE has migrated onto the LCRC property, this is not a strict liability case. Gould does not establish a prima facie case simply by showing that TCE is present on the LCRC property. Rather, Gould must affirmatively establish that there was an actual release of hazardous substances on the LCRC property which directly caused Gould to incur response activity costs. Without establishing this causal connection, there is no basis for Gould to request that any response activity costs be allocated to LCRC. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999).

LCRC: 2.    LCRC contests Gould's supporting Fact 1(a) because the TCE present on the LCRC property has migrated from the Gould property.

LCRC: 3.    LCRC contests Gould's Supporting Fact 1(b) because LCRC only acknowledges that its property is contaminated with TCE which has migrated from the Gould facility.

LCRC: 4.    LCRC contests Gould's Supporting Facts 1(c) and (d) because the facts as presented by Gould are incomplete and misleading. The MDEQ's identification of the LCRC property as a "facility" was based on two separate contaminant plumes of salt and volatile organic compounds (VOCs). LCRC has recently met with MDEQ officials to acknowledge responsibility for the salt plume and provide data which establishes that all of the VOC contamination on the LCRC property migrated from the Gould property. Accordingly, LCRC is in the process of submitting to MDEQ a request for no further action (NFA) report with respect to the VOC contamination on its property. If the NFA report is approved, LCRC will not be obligated to take any further action with respect to the VOC contamination. LCRC is also in the process of submitting to MDEQ a corrective action plan with respect to the salt contamination along with an affidavit to support unremediated releases pursuant to R 299.5534 of the Part 201 Administrative Rules which provides the reasons LCRC has no liability for the VOC contamination.

LCRC: 5.    LCRC contests Gould's Supporting Fact 1(e) to the extent Gould's use of the term "facility" is based upon the definition of that term under CERCLA.

Gould: (2)    There has been a "release" or threatened release of a "hazardous substance"

4

Gould: "The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 USCS §§ 2011 et seq.], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 USCS § 2210], or, for the purposes of section 104 of this title [42 USCS § 9604] or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 [42 USCS § 7912(a) or 7942(a)], and (D) the normal application of fertilizer." 42 U.S.C. §9601(22).

Gould: A "hazardous substance" is defined as "(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 USCS §§ 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas)." 42 U.S.C. §9601.

Gould: "TCE, according to the World Health Organization, is "probably carcinogenic to humans," and has been designated a hazardous substance

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1224   Filed 05/14/19   Page 7 of 50

2:17-cv-11130-MAG-DRG    Doc # 27-4    Filed 05/03/18    Pg 7 of 52    Pg ID 551
4:09-cv-12633-MAG-MJH    Doc # 147    Filed 05/25/12    Pg 9 of 137    Pg ID 3344

for purposes of CERCLA liability." U.S. Bank N.A. v. United States
EPA, 563 F.3d 199, 203 (6th Cir. 2009), citing 40 C.F.R. § 302.4.

Gould: "[G]iven the breadth of CERCLA, it seems virtually impossible to
conceive of a situation where hazardous substances are found in the soil
and not *ipso facto* 'released' into the environment." Northwestern Mutual
Life Insurance Co. v. Atlantic Research Corp., 847 F. Supp 389, 395 (E.D.
Va. 1994).

Gould: "[T]he statute does not, on its face, impose any quantitative requirements
or concentration level on the definition of "hazardous substances."
Rather, the substance under consideration must simply fall within one of
the designated categories." United States v. Alcan Aluminum Corp., 964
F.2d 252, 260 (3rd Cir. 1992).
*Plaintiff's Supporting Facts*

Gould: (a)     The LCRC Property is contaminated with TCE.

Gould: (b)     The MDEQ notified Defendant in 2007 that soil and groundwater
samples indicated that releases of TCE have occurred on the LCRC
Property.

### Contested by LCRC:

LCRC 1.     LCRC contests Gould's Supporting Facts 2(a) and (b) on the same basis that
LCRC contests Gould's Supporting Facts 1(a), (b), (c) and (d).

### Gould: (3)     The release has caused Plaintiff to incur "necessary costs of response"

Gould: 42 U.S.C. §9601(25) defines "response" for purposes of CERCLA. "The
terms "respond" or "response" means [mean] remove, removal,[2] remedy,[3]

---

[2] "The terms "remove" or "removal" means [mean] the cleanup or removal of released hazardous
substances from the environment, such actions as may be necessary taken in the event of the threat of
release of hazardous substances into the environment, such actions as may be necessary to monitor,
assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed
material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage
to the public health or welfare or to the environment, which may otherwise result from a release or threat
of release. The term includes, in addition, without being limited to, security fencing or other measures to
limit access, provision of alternative water supplies, temporary evacuation and housing of threatened
individuals not otherwise provided for, action taken under section 104(b) of this Act [42 U.S.C.
§9604(b)], and any emergency assistance which may be provided under the Disaster Relief Act and
Emergency Assistance Act." 42 U.S.C. §9601(23).

[3] "The terms "remedy" or "remedial action" means [mean] those actions consistent with permanent
remedy taken instead of or in addition to removal actions in the event of a release or threatened release of
a hazardous substance into the environment, to prevent or minimize the release of hazardous substances

and remedial action;[,] all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto." 42 U.S.C. §9601(25).

Gould: "Under CERCLA's expansive definition of "removal," it follows that a "response" includes environmental studies of a facility undertaken to "monitor, assess, and evaluate" the release of hazardous substances. Thus, costs incurred for purposes of evaluation and investigation, such as the studies undertaken by plaintiff, qualify as 'response costs.'" <u>Northwestern Mutual Life Insurance Co. v. Atlantic Research Corp.</u>, 847 F. Supp 389, 396 (E.D. Va. 1994).

Gould: Many CERCLA cases are "two-site" cases in which hazardous substances have migrated from one site onto the plaintiff's property. When analyzing causation in such a situation, the Fourth Circuit has stated:

> Contrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant. <u>Castaic Lake Water Agency v. Whittaker Corp.</u>, 272 F. Supp.2d 1053 (C.D. Cal. 2003) (quoting <u>Westfarm Assoc. Limited Partnership v. Washington Suburban Sanitary Comm'n</u>, 66 F.3d 669, 681 (4th Cir. 1995)).

Gould: "[U]nder CERCLA, "the occurrence of the statutorily-specified event," namely the release of hazardous substances, creates liability for "any party falling within a class defined in section 9607(a)." Therefore, CERCLA does not require a plaintiff to show that a particular defendant actually caused the release of hazardous substances; rather, CERCLA only requires that a plaintiff establish that a release occurred and that each defendant qualifies as a liable party under the statute." <u>Northwestern Mutual Life Insurance Co. v. Atlantic Research Corp.</u>, 847 F. Supp 389, 397 (E.D. Va. 1994)(internal citations omitted).

---

[3 cont.] so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." 42 U.S.C. §9601(24).

7

Gould:        *National Contingency Plan ("NCP")*

Gould:        Recoverable response costs must relate to response activities that were in
              "substantial compliance" with certain requirements of the National
              Contingency Plan ("NCP"). 40 C.F.R. §300.700(c)(3)(i).  The NCP
              requires that "the selection of the response action" should be subject to
              public comment and identifies several categories of "potentially
              applicable" activities for public comment. 40 C.F.R. §300.700(c).  "The
              NCP's procedural requirements include, among other things, that the party
              seeking response costs conduct a remedial site investigation (40 C.F.R. §
              300.700(c)(5)(vii)), prepare a remedial investigation and feasibility study
              ("RI/FS")(40 C.F.R. 300.700(c)(5)(viii), and provide an opportunity for
              public comment (40 C.F.R. 300.700(c)(6)). City of Moses Lake v. United
              States, 458 F. Supp 2d 1198, 1236 (E.D. Wash. 2006).

Gould:        "[T]he Sixth Circuit has indicated that "preliminary" or "initial"
              investigative costs may be recovered even if the plaintiff did not comply
              with the NCP." Krygoski Construction Co. v. City of Menominee, 431 F.
              Supp. 2d 755, 762 (W.D. Mich. 2006), citing Pierson Sand & Gravel, Inc.
              v. Pierson Township, 89 F.3d 835, 1996 WL 338624 *6. In Village of
              Milford v. K-H Holding Corp., 390 F.3d 926, 934 (6th Cir. 2004), the
              Sixth Circuit held that "Consistency with the NCP is not required for
              recovery of monitoring and investigation costs."  The court also ruled that
              investigatory and "removal" costs were not subject to the NCP's public
              comment requirements, and that an interim removal could be considered a
              "necessary" response even if there was not an environmental emergency.
              Id.  Furthermore, "[T]he detailed NCP provisions governing other
              response actions cannot reasonably be applied to preliminary monitoring
              and evaluation of a release of a hazardous substance." Vine St., LLC v.
              Keeling, 460 F. Supp. 2d 728, 759 (E.D. Tex. 2006).

              *Plaintiff's Supporting Facts*

Gould: (a)    Plaintiff has incurred substantial necessary response costs working
              cooperatively with the MDEQ to investigate and conduct interim
              response activities with respect to the TCE contamination at issue.

Gould: (b)    Although Plaintiff continues to incur additional response costs and
              no final remediation plan has been selected or approved yet,
              Plaintiff anticipates it will have to incur substantial future response
              costs to remediate the contamination at issue.

Gould: (c)    The response costs incurred to date have been, and the anticipated
              future response costs will be, consistent with the NCP as

8

2:17-cv-11130-MAG-DRG    Doc # 27-4    Filed 05/03/18    Pg 10 of 52    Pg ID 554

4:09-cv-12633-MAG-MJH    Doc # 147    Filed 05/25/12    Pg 12 of 137    Pg ID 3347

administered by the MDEQ, which has expressed its intent to seek public comment once it selects a proposed remediation plan.

**Contested by LCRC:**

LCRC 1.  The standard of proof alleged by Gould is directly contrary to established Sixth Circuit law. In a case such as this involving the migration of contamination onto another site, the Sixth Circuit has described the causation standard as follows:

> In a "two site" case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, <u>the plaintiff must establish a causal connection</u> between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up.

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (emphasis added).

LCRC 2.  LCRC contests Gould Supporting Fact 3(b) because in a letter dated November 28, 2000, the MDEQ approved remedial action plan to excavate contaminated soils from the site.

LCRC 3.  LCRC contests Gould Supporting Fact 3(c) because Gould did not provide for any public comment as required by the National Contingency Plan.

### Gould: (4)  Defendant falls into one of four categories of potentially responsible parties (PRPs)

Gould: "Under the statute, there are four categories of PRPs: 1) the current owner and operator of a facility; 2) any previous owner or operator during any time in which hazardous substances were disposed at a facility; 3) any person who arranged for disposal or treatment of hazardous substances at a facility; and 4) any person who transported hazardous substances to a waste facility." <u>Saline River Props., LLC v. Johnson Controls, Inc.</u>, 2011 U.S. Dist. LEXIS 119516, *37 (E.D. Mich. 2011) citing 42 U.S.C. §9607(a)(1–4).

*Plaintiff's Supporting Facts*

Gould: (a)  Defendant currently owns the LCRC Property, and it owned the LCRC Property when it conducted its road operations from there from the 1930s until 1990.

*Gould: b)*  **Burden of Proof**

9

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1228   Filed 05/14/19   Page 11 of 50

2:17-cv-11130-MAG-DRG    Doc # 27-4   Filed 05/03/18   Pg 11 of 52   Pg ID 555
4:09-cv-12633-MAG-MJH    Doc # 147   Filed 05/25/12   Pg 13 of 137   Pg ID 3348

Gould: "It is well-established that CERCLA liability is strict liability, subject only to the limited defense in section 107(b)(4) of the Act." "Generally, in a civil case, the plaintiff has met its burden of proof as long as it is established by a preponderance of the evidence that a particular fact is more likely true than not. Hastings Bldg. Prods. v. National Aluminum Corp., 1991 U.S. Dist. LEXIS 6443, *13 (W.D. Mich. 1991)("[Plaintiff] insists that it is not 'required to prove that there is absolute certainty that the release occurred during [defendant's] ownership.' The Court, of course, understands this; it is inherent in the preponderance of the evidence standard. The Court also recognizes that many times the factual issues in CERCLA cases, i.e., the exact source of contamination, cannot be established to an exact degree of certainty.") Id.

Gould: Once the foregoing elements are satisfied, the defendant must establish by "a preponderance of the evidence" that the release of a hazardous substance and the damages resulting therefrom were caused *solely by* –

    (1) an act of god;

    (2) an act of war;

    (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

    (4) any combination of the foregoing paragraphs.

See 47 USC §9607(a) & (b).

### *Gould: c)*   Allocating response activity costs under CERCLA

Gould: A court "may consider any factor it deems in the interest of justice in allocating contribution recovery." United States v. R.W. Meyer, Inc., 932 F.2d 568, 572 (6th Cir. 1991) (rejecting limitation under common law contribution to "the percentage a party's improper conduct causally contributed to the toxicity of the site in a physical sense," asserting "by using the term 'equitable factors' Congress intended to invoke the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances"). . . . "No exhaustive list of criteria need or should be formulated. However . . . the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any

10

traditional equitable defenses as mitigating factors and any other factors deemed appropriate to balance the equities of the circumstances." Id.

Gould: In the context of claims under §113(f)(1), many courts look to the "Gore Factors" to apportion contribution claims. The Gore Factors are: "(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the federal, state or local officials to prevent any harm to the public health or the environment." ITT Industries, Inc. v. BorgWarner, Inc., 700 F. Supp. 2d 848, 890 (W.D. Mich. 2010). See also United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir. 1991).

### Plaintiff's Supporting Facts

(a) Distinguishability. From the available information, it appears that Defendant and Plaintiff share responsibility for the TCE contamination and, other than Dr. Feenstra's conclusion that the majority of the contamination in Defendant's yard is attributable to Defendant's activities, there is no principled basis to distinguish their respective contributions further.

(b) Quantities. Other than the fact that both Plaintiff and Defendant used TCE and there are no records of disposal. The quantities are not known. This element is most likely neutral.

(c) Degree of toxicity. This element is neutral, as the case concerns TCE for both parties.

(d) Degree of involvement. Initially, Defendant denied any involvement in the use of TCE and falsely certified that position to the MDEQ. Through discovery in this case, Defendant has been forced to admit its use of TCE. There are no witnesses who have knowledge regarding the eventual disposal of the bulk TCE used by Defendant. Some reference is made to Safety Kleen having picked up the TCE, however, Safety Kleen's records contain no such evidence, particularly during the time frame prior to the RCRA land ban. Dr. Feenstra has noted that the accepted method of TCE disposal prior to the RCRA land ban involved disposal on the ground away from inhabited structures, which is consistent with the hydrogeologic information. Again, this element appears to be neutral.

(e) <u>Degree of care</u>. Defendant's refusal to fully assess its site and its misrepresentations to the MDEQ evidence a lack of care.

(f) <u>Degree of cooperation</u>. Plaintiff has fully cooperated and funded the work necessary to investigate the problem, identify PRPs and evaluate the remediation alternatives. The MDEQ agrees that Plaintiff has been cooperative. As evidenced by Defendant's obfuscation, misrepresentation and foot dragging, Defendant has not cooperated. This factor tilts heavily in favor of Plaintiff.

**Contested by LCRC:**

LCRC contests Gould's description of the burden of proof for the same reasons it contested Gould's description of the burden of proof in element no. 1 to the CERCLA cost recovery claim.

**Gould:     2.     Count II – Contribution claim pursuant to Mich. Comp. Laws Ann. §324.20129**

*Gould:   a)      Elements of Count II*

Gould: "As NREPA (formerly MERA) was patterned after CERCLA, it should be construed in accordance with the federal statute." City of Detroit v. Simon, 247 F.3d 619, 630 (6th Cir. 2001). "Because NREPA is CERCLA's counterpart, and is to be construed in accordance with the federal statute, this analysis is nearly identical to the above analysis as to whether there was a "release" that caused "necessary response costs" under CERCLA." Saline River Props., LLC v. Johnson Controls, Inc., 2011 U.S. Dist. LEXIS 119516, *44 (E.D. Mich. 2011).

Gould: Pursuant to the December 14, 2010 amendments to part 201, section 20126a's "necessary" requirement has been replaced with a "reasonably incurred under the circumstances" requirement. MCL 324.20126a(1)(b)(Pursuant to section 20126a, "a person who is liable under section 20126 is jointly and severally liable for all of the following: . . .(b) Any other cost of response activity reasonably incurred under the circumstances by any other person. . . .").

Gould: Under Section 20129,

A person[4] may seek contribution from any other person who is liable under section 20126 during or following a civil action brought under this part. This subsection does not diminish the right of a person to bring an action for contribution in the absence of a civil action by the state under this part. . . .

[4] "Person" means an individual, partnership, corporation, association, governmental entity, or other legal entity. MCL 324.301(h).

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1231   Filed 05/14/19   Page 14 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 14 of 52   Pg ID 558
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 16 of 137   Pg ID 3351

Gould: MCL 324.20129(3). Under Section 20126, the following persons are liable:

(a)     The owner or operator of a facility[5] if the owner or operator is responsible for an activity causing a release[6] or threat of release.

(b)     The owner or operator of a facility at the time of disposal of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.

(c)     An owner or operator of a facility who becomes an owner or operator on or after June 5, 1995, unless the owner or operator complies with both of the following:

(i)      A baseline environmental assessment is conducted prior to or within 45 days after the earlier of the date of purchase, occupancy, or foreclosure. For purposes of this section, assessing property to conduct a baseline environmental assessment does not constitute occupancy.

(ii)     The owner or operator provides a baseline environmental assessment to the department and subsequent purchaser or transferee within 6 months after the earlier of the date of purchase, occupancy, or foreclosure.

\*          \*          \*

MCL 324.20126(1)(a-c).

Gould: "To be liable under NREPA, a defendant must have "caused" a release or threat of release of a hazardous substance, leading to the incurrence of response costs[7]." Village of Milford v. K-H Holding Corp., 390 F.3d 926, 936 (6th Cir. 2004).

---

[5] "Facility" means any area, place, or property where a hazardous substance in excess of the concentrations that satisfy the cleanup criteria for unrestricted residential use has been released, deposited, disposed of, or otherwise comes to be located. MCL 324.20101(r).

[6] "Release" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a hazardous substance into the environment, or the abandonment or discarding of barrels, containers, and other closed receptacles containing a hazardous substance. MCL 324.20101(ll).

[7] "Response activity costs" or "costs of response activity"" means all costs incurred in taking or conducting a response activity, including enforcement costs. MCL 324.20101(qq). "Response activity" means evaluation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision, or with the approval of, the department of community health and enforcement actions related to any response activity. MCL 324.20101(pp). "Enforcement costs" means court expenses, reasonable

*Plaintiff's Supporting Facts*

The facts supporting Plaintiff's claim under Count I similarly support Plaintiff's claim under Count II.

Gould:   **b)**   **Allocating response activity costs and damages**

Gould: In a contribution action brought under Part 201 of NREPA, the court shall consider all of the following factors in allocating response activity costs and damages among liable persons:

(a)   Each person's relative degree of responsibility in causing the release or threat of release.

(b)   The principles of equity pertaining to contribution.

(c)   The degree of involvement of and care exercised by the person with regard to the hazardous substance.

(d)   The degree of cooperation by the person with federal, state, or local officials to prevent, minimize, respond to, or remedy the release or threat of release.

(e)   Whether equity requires that the liability of some of the persons should constitute a single share.

MCL 324.20129(3).

*Plaintiff's Supporting Facts*

The facts supporting Plaintiff's claim under Count I similarly support Plaintiff's claim under Count II.

**Contested by LCRC**

LCRC 1.   Please see Gould's Supporting Facts contested by LCRC under Count I.

**B.**   **Defendant's Defenses.**

**LCRC'S DEFENSES TO GOULD'S CERCLA COST RECOVERY CLAIM**

1.   <u>Gould's Claim for Cost Recovery Under CERCLA is Barred by the Six-Year Statute of Limitations for Remedial Actions.</u>

---

attorney fees of the attorney general, and other reasonable expenses of an executive department that are incurred in relation to enforcement under this part. MCL 324.20101(m).

a.  **Elements of the Defense**

LCRC: The six-year statute of limitations in CERCLA for cost recovery action states as follows:

> An initial action for recovery of costs ... must be commenced ... for a remedial action, within six years after initiation of physical onsite construction of the remedial action ... 42 U.S.C. §9613(g)(2).

LCRC: CERCLA's definition of a "remedial action" includes "dredging or excavations." 42 U.S.C. § 9601(24).

LCRC b.    **Supporting Facts**

LCRC: 1.     The first remedial action at the Gould Facility occurred in 1988 when Michigan National Bank excavated contaminated soil from the property. (1989 ASTI Report)  Since the contamination was clearly Gould's responsibility, in 1995 Gould reimbursed Michigan National Bank for its remediation costs in the amount of $195,000.  (Settlement Agreement)

LCRC: 2.     In March of 2001, more than 12 years after the initial remedial action, Gould excavated 464 cubic yards of soil from the site which was contaminated with TCE.  (Interim Soil Remediation Report)

LCRC: 3.     Gould did not file this cost recovery action until July 6, 2009, more than eight years after the 2001 excavation.

LCRC: 4.     Gould's excavation activities were conducted in response to a directive from MDEQ in August of 2000 that Gould implement a "remedial action plan" which "shall protect public health, safety, and welfare and the environment."  The MDEQ directive stated that "seven years has passed" since Gould became aware of the contamination and that analytical results "indicate that a plume with high levels of TCE (23,000 ppb) has migrated beyond the property boundaries."  The MDEQ directive also required that Gould's remedial action plan "include an evaluation of heavily contaminated soil that may serve as a source of groundwater contamination."  (8/2/2000 MDEQ Letter)

LCRC: 5.     In accordance with the directive from MDEQ, Gould's remedial action plan included the excavation of 464 cubic yards of heavily contaminated soil from the site.

LCRC: 6.     After performing the excavation activities, Gould prepared a document entitled "Interim Soil Remediation Report."

LCRC: 7.     In the report, Gould makes it clear that the soil remediation was performed in response to the August 2, 2000 directive from MDEQ.  Throughout the report Gould repeatedly characterizes its activities at the site as "remediation activities" or "soil remediation."

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1234   Filed 05/14/19   Page 17 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 17 of 52   Pg ID 561
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 19 of 137   Pg ID 3354

LCRC: 8.     Photographs of the remedial action establish the presence of an excavator onsite to conduct the excavation of the contaminated soils.

**Plaintiff contests Defendant's selective characterization of the "facts," as more fully set forth in the Plaintiff's Defenses section of this order below.**

### LCRC:     c.     Authority for Defense

LCRC: The courts have consistently held that excavation and other similar activities at a site constitute "initiation of physical onsite construction" sufficient to trigger the six-year statute of limitations. *Yankee Gas Services v. UGI Utilities*, 616 F. Supp. 2d, 228 (Dist. Conn. 2009); *Schaefer v. Town of Victor*, 457 F.3d 188 (2nd Cir. 2006). In *Yankee Gas*, the plaintiff excavated contaminated soil from two different sites and defendant raised the statute of limitations because the cost recovery action was filed more than six years after the excavations occurred. Plaintiff argued that the statute of limitations had not been triggered because the soil excavations were just preliminary actions and they were not consistent with a permanent remedy. In rejecting the plaintiff's argument that the excavations were only preliminary, the court noted that the definition of "remedial action" in CERCLA includes excavations. *Id.,* at 274-275. The court also noted that the excavations were done in part to prevent or minimize the migration of contaminants, another component of "remedial action" under CERCLA. *Id.,* at 275.

LCRC: In *Schaefer*, the activity at issue was excavation of soils onsite which were used as cover for a landfill closure. Much like Gould, the plaintiff in *Schaefer* engaged in numerous tactics which delayed the remedial action for years. Plaintiff then attempted to avoid the statute of limitations by characterizing the excavation activities as inconsistent with a permanent remedy. The court rejected plaintiff's argument and held that the cost recovery claims were barred by the six-year statute of limitations. *Id.,* at 209-210.

### LCRC 2.     Gould Cannot Establish a Prima Facie Case of Liability Against LCRC Because There was No Release of a Hazardous Substance at the LCRC Facility Which has Caused Gould to Incur Response Costs.

### LCRC:     a.     Elements of the Defense

LCRC: In order for Gould to make a prima facie case of CERCLA liability against LCRC, Gould must establish that there was a release or threatened release of a hazardous substance at the LCRC facility which caused Gould to incur response costs. 42 U.S.C. § 9607(a); *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065 (6th Cir. 1999). Gould cannot establish the release of a hazardous substance at the LCRC facility and therefore its CERCLA cost recovery claim must fail.

### LCRC:     b.     Supporting Facts

LCRC: 1.     Gould deposed 34 LCRC employees and asked 29 of them whether they had any personal knowledge of anyone ever disposing of hazardous substances on the property. All 29

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1235   Filed 05/14/19   Page 18 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 18 of 52   Pg ID 562
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 20 of 137   Pg ID 3355

witnesses testified unequivocally that improper disposal of TCE or other hazardous substances had never occurred on the property.

LCRC:2.     Gould witnesses have specifically acknowledged that they have no evidence of LCRC employees improperly disposing of TCE on the property.   When Thomas Cok, hydrogeologist for MSG, was asked whether he had any physical evidence that there was disposal of TCE on the LCRC property, he stated: "I have none. ... I have no evidence to support how it got there." (Exhibit H, Cok Dep. Vol. II, p. 123)

LCRC:3.     Gould's entire theory of liability against LCRC is based on the premise that LCRC dumped so much TCE on its property that it created a dense nonaqueous phase liquid (DNAPL) source on the property which occurs with TCE concentrations in excess of 1 million ug/L.   Yet Gould's expert Dr. Stanley Feenstra acknowledges that no DNAPL concentrations of TCE have ever been located on the LCRC property. (Exhibit E, Feenstra Dep., pp. 122-123)

LCRC:4.     Feenstra has never set foot on the LCRC property, has never gathered any data and admits that Gould has no plans to gather additional data to support his purely speculative theory. (Feenstra Dep., pp. 126, 137-139)

LCRC:5.     Feenstra acknowledges that he has no idea how TCE may have been released at the LCRC property. (Feenstra Dep., p, 125)

LCRC:6.     For approximately two years in the early 1980s, LCRC performed limited asphalt bituminous testing at its offices on the LCRC property. (Little Dep., pp. 11-12)

LCRC:7.     The testing was only done during the summer months when LCRC had a paving job which was approximately 25 times per summer. (Marr Dep., pp. 18-19)

LCRC:8.     Most of the asphalt testing done in connection with LCRC paving jobs was performed off site. Most samples would be sent to a Chicago lab for testing and other samples were tested in MDOT trailers offsite. (Marr Dep., p. 11)

LCRC:9.     The asphalt tests that were done on the LCRC property involved taking a sample of asphalt from the street and adding a small amount of TCE in an extracting machine. (Marr Dep., p. 11)  The TCE dissolved the asphalt sample which would then be spun in a centrifuge, leaving material that is dried and weighed to calculate the bitumen content as a percentage of the weight of the asphalt sample. (Little Dep., pp. 13-14)

LCRC:10.     The spent TCE from the asphalt testing process was transferred to a five-gallon recovery can and then placed into a sealed 55-gallon drum. (Marr Dep., p. 12)  The spent TCE was removed from the property by an outside vendor for disposal. (Little Dep., p. 14)

LCRC:11.     The asphalt testing process always occurred in a laboratory inside the office building which is located on the southeast corner of the LCRC property. (Little Dep., pp. 15-16)

17

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1236   Filed 05/14/19   Page 19 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 19 of 52   Pg ID 563
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 21 of 137   Pg ID 3356

LCRC:12.     TCE concentrations have been detected only in the northwest corner of the LCRC
property.

LCRC:.13.     A substantial portion of the LCRC property was paved in 1979.   (October 1979
paving records North Street Yard)

**Plaintiff contests Defendant's selective characterization of the "facts," as more fully set
. forth in the Plaintiff's Defenses section of this order below.**

LCRC:        c.     Authority for Defense

LCRC:The Sixth Circuit has held that the plaintiff in a CERCLA cost recovery action cannot
establish a release from defendant's facility only through speculative expert testimony.   In
*Kalamazoo River, supra,* the defendant owned an automotive parts manufacturing plant located
3200 feet from an entry point into the Kalamazoo River.   Plaintiff alleged that defendant's
facility discharged PCB into the Kalamazoo River which caused plaintiff to incur response
activity costs.   While there was a release of PCB at the defendant's facility, the evidence
established that the extent of the PCB release fell 1700 feet short of the entry point to the river,
Plaintiff's expert conducted a stream flow analysis and concluded that defendant's facility was
responsible for discharging PCB into the river.   Yet because the evidence established that there
was a 1700-foot gap where no PCBs had ever been detected, the Sixth Circuit affirmed summary
judgment in favor of the defendant because the expert's conclusion was based on an unreliable
foundation.   The Court held that the expert's opinion was "based solely on speculation and
possibility" and that plaintiff failed to establish its burden of proof that the defendant "did
contribute to PCBs in the Kalamazoo River; not that it is possible that it might have contributed
to the PCBs." *Id.,* at 1072; *see also, Thomas v. FAG Bearings Corp.,* 846 F. Supp. 1382 (W.D.
Missouri, 1994); *Innis Arden v. Pitney Bowes,* 629 F. Supp. 2d 175 (D. Conn. 2009).

LCRC: 3.     **Gould's Cost Recovery Claim Under CERCLA Must be Dismissed
             Because Gould Did Not Provide for Any Public Comment As
             Required by the National Contingency Plan.**

LCRC: ·a.     Elements of the Defense

LCRC:One of the conditions for a private party to recover its response costs is that the
responsive actions taken and the costs incurred must have been consistent with the National
Contingency Plan ("NCP"), 42 U.S.C. § 9607(a)(4)(B).   The NCP is a set of regulations
promulgated by the Environmental Protection Agency which establish criteria and provide
guidance for appropriate site investigation, analysis of remedial alternatives and selection of a
cost-effective remedial action. A private party cost recovery action is consistent with the NCP:

          if the action, when evaluated as a whole, is in substantial compliance with the
          applicable requirements in paragraphs (5) and (6) of this section, and results in a
          CERCLA-quality cleanup.

18

40 C.F.R. § 300.700(c)(3)(i).

LCRC: Paragraph (6) requires private parties to provide an opportunity for public comment throughout the remedial investigation. The NCP provides:

> Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements stated therein:
>
> (i)     Section 300.155 (on public information and community relations);
>
> (ii)    Section 300.415(n) (on community relations during removal actions);
>
> (iii)   Section 300.430(c) (on community relations during RI-FS (except paragraph (c)(5));
>
> (iv)    Section 300.430(f)(2), (3) and (6) (on community relations during selection of remedy; and
>
> (v)     Section 300.435(c) (on community relations during RD/RA and operation and maintenance.

40 C.F.R. § 300.700(c)(6).

LCRC: All of the regulations in paragraph 6 above provide for participation by the general public in decisions made throughout the remedial investigation that could affect environmental conditions in their neighborhood. For example, during the investigation, § 300.430(c) requires the private party to conduct interviews with local officials and community residents to solicit their concerns and needs for information and then prepare a formal community relations plan ("CRP") based on the interviews. The purpose of the CRP is to ensure the public appropriate opportunities for involvement in site-related decisions including site analysis and characterization, analysis of remedial alternatives and selection of a remedy.

LCRC: During the process of selecting a remedy, § 300.430(f)(3) requires that a brief analysis of the proposed plan be published in a major local newspaper. This section also requires that the private party provide at least 30 days for the submission of written and oral comments from the public and arrange for a public meeting to be held during the public comment period at or near the site of contamination.

### LCRC: c.    Defendant's Supporting Facts

19

LCRC: The Gould Facility is located in an area which includes many residential properties and therefore the opportunity for public comment is clearly a critical component of any remedial investigation of the TCE plume which is migrating toward Thompson Lake. Yet it is undisputed that Gould never held any meetings to inform the residents of the contamination or otherwise provided for public comment during its remedial investigation.

**Plaintiff contests Defendant's selective characterization of the "facts," as more fully set forth in the Plaintiff's Defenses section of this order below.**

**LCRC: d.   Authority for the Defense**

LCRC: Federal courts in the Sixth Circuit and throughout the country have consistently held that if a private party fails to provide for the required opportunity for public comment, then the remedial action is inconsistent with the NCP and the private party is barred from recovering its costs. *Sherwin Williams Co. v. City of Hamtramck,* 840 F. Supp. 470, 476 (E.D. Mich. 1993); *Pierson Sand & Gravel v. Pierson Twp,* 851 F. Supp. 850, 856 (W.D. Mich. 1994), aff'd 89 F.3d 835 (6th Cir. 1996); *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.,* 748 F. Supp. 373, 389 (E.D. N.C. 1990); *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514-1515 (10th Cir. 1991).

LCRC: In *Sherwin Williams,* the City of Hamtramck excavated and disposed of contaminated soil under the guidance and supervision of the MDEQ. The City brought a private cost recovery action under CERCLA against Sherwin Williams, the previous owner of the contaminated site. Sherwin Williams brought a motion for summary judgment on the basis that the City's remedial action was inconsistent with the NCP because the City failed to provide for public comment. The City acknowledged that no public meetings were held, but argued that the involvement of the MDEQ satisfied the public comment requirement of the NCP. In rejecting the City's argument and granting Sherwin Williams' motion for summary judgment, the court stated:

> The court finds that the City's failure to provide an opportunity for public comment was a material and substantial departure from the NCP. ...

*Id.,* at 477.

LCRC: In *Pierson Sand & Gravel,* Pierson purchased a former landfill which was later identified as a source of groundwater contamination. Pursuant to directives from MDEQ, Pierson incurred response costs to investigate and remediate the site and it brought a private cost recovery action under CERCLA to recover its response costs against multiple defendants. The defendants brought motions for summary judgment on the basis that Pierson had failed to provide for public comment during the remedial investigation as required by the NCP. Even though two public meetings were held during which the remedial action plan was discussed, the court still found that Pierson was barred from recovering its response costs because it had not provided an adequate opportunity for meaningful public comment in compliance with the NCP. *Id.,* at 857.

**LCRC:   4.   LCRC is Not Liable to Gould for its CERCLA Cost Recovery Claim Because LCRC is the Owner of Contiguous Property that has been**

20

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1239   Filed 05/14/19   Page 22 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 22 of 52   Pg ID 566
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 24 of 137   Pg ID 3359

<u>Contaminated by a Release of Hazardous Substances from Property
Owned by Gould.</u>

**LCRC: a.   <u>Elements of Defense.</u>**

LCRC: 42 U.S.C. 9607(q) provides in pertinent part:

**(q) Contiguous properties** (1) Not considered to be an owner or operator. (A) In general.  A person that owns real property that is contiguous to or otherwise similarly situated with respect to, and that is or may be contaminated by a release or threatened release of a hazardous substance from, real property that is not owned by that person shall not be considered to be an owner or operator of a vessel or facility under paragraph (1) or (2) of subsection (a) solely by reason of the contamination if—

   (i)   the person did not cause, contribute, or consent to the release or threatened release;

   (ii)   the person is not—

        (I)  potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through any direct or indirect familial relationship or any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by a contract for the sale of goods or services); or

        (II)  the result of a reorganization of a business entity that was potentially liable;

   (iii)  the person takes reasonable steps to—

        (I)  stop any continuing release;

        (II)  prevent any threatened future release; and

        (III)  prevent or limit human, environmental, or natural resource exposure to any hazardous substance released on or from property owned by that person;

   (iv)  the person provides full cooperation, assistance, and access to persons that are authorized to   conduct response actions or natural resource restoration at the vessel or facility from which      there has been a release or threatened release (including the cooperation and access    necessary for the installation, integrity, operation, and maintenance of any complete or   partial response action or natural resource restoration at the vessel or facility);

   (v)    the person—

        (I)  is in compliance with any land use restrictions established or relied on in connection with the response action at the facility; and

        (II)  does not impede the effectiveness or integrity of any institutional control employed in connection with a response action;

   (vi)  the person is in compliance with any request for information or administrative subpoena  issued by the President under this Act;

   (vii)  the person provides all legally required notices with respect to the discovery or release of any   hazardous substances at the facility; and

   (viii) at the time at which the person acquired the property, the person—

21

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1240   Filed 05/14/19   Page 23 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 23 of 52   Pg ID 567
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 25 of 137   Pg ID 3360

(I)    conducted all appropriate inquiry within the meaning of section 101(35)(B) [42 USCS § 9601(35)(B)] with respect to the property; and

(II)    did not know or have reason to know that the property was or could be contaminated by a release or threatened release of one or more hazardous substances from other real property not owned or operated by the person.

(B) Demonstration. To qualify as a person described in subparagraph (A), a person must establish by a preponderance of the evidence that the conditions in clauses (i) through (viii) of subparagraph (A) have been met.

(C) Bona fide prospective purchaser. Any person that does not qualify as a person described in this paragraph because the person had, or had reason to have, knowledge specified in subparagraph (A)(viii) at the time of acquisition of the real property may qualify as a bona fide prospective purchaser under section 101(40) [42 USCS § 9601(40)] if the person is otherwise described in that section.

(D) Ground water. With respect to a hazardous substance from one or more sources that are not on the property of a person that is a contiguous property owner that enters ground water beneath the property of the person solely as a result of subsurface migration in an aquifer, subparagraph (A)(iii) shall not require the person to conduct ground water investigations or to install ground water remediation systems, except in accordance with the policy of the Environmental Protection Agency concerning owners of property containing contaminated aquifers, dated May 24, 1995.

LCRC:    **b.**    **Defendant's Supporting Facts.**

LCRC: 1.    LCRC relies on the supporting facts for its CERCLA cost recovery claim against Gould and its Defense No. 2 to Gould's CERCLA cost recovery claim.

LCRC: 2.    LCRC does not have an ownership interest in the Gould property.

LCRC: 3.    LCRC did not cause or contribute to the release of hazardous substances on the Gould property nor is it affiliated with any entity which is responsible for the release of hazardous substances at the Gould facility.

LCRC: 4.    LCRC has acted reasonably with respect to the TCE contamination on its property which has migrated from the Gould facility.

LCRC: 5.    LCRC has provided Gould with access to its property for the purpose of conducting response activities.

LCRC: 6.    When LCRC originally acquired the property in 1933, it had no reason to know that the property was or could be contaminated by a release from the Gould property.

**Plaintiff contests Defendant's selective characterization of the "facts," as more fully set forth in the Plaintiff's Defenses section of this order below.**

LCRC:    **c.**    **Authority for the Defense.**

22

LCRC: The authority for this statutory defense is set forth in 42 U.S.C. 9607(q).

LCRC: **LCRC'S DEFENSES TO GOULD CONTRIBUTION CLAIM UNDER NREPA**

LCRC:   1.   <u>Gould's Claim for Contribution Under NREPA is Barred by the Six-Year Statute of Limitations for Remedial Actions.</u>

LCRC:   a.   <u>Elements of the Defense</u>

LCRC: Similar to CERCLA, NREPA allows:

> For the recovery of response activity costs ... within six years of initiation of physical onsite construction activities for the remedial action selected or approved by the department at a Facility ... MCL 324.20140(1)(a)

LCRC: NREPA defines "remedial action" as follows:

> "Remedial action" includes, but is not limited to, **clean up, removal,** containment, isolation, destruction, or treatment of a hazardous substance released or threatened to be released into the environment, monitoring, maintenance, or the taking of other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety or welfare, or to the environment.  MCL 324.20101(mm) (Emphasis added).

LCRC:   b.   <u>Supporting Facts</u>

LCRC: 1.   It is undisputed that the excavation conducted by Gould in March of 2001 was specifically approved by MDEQ.

LCRC: 2.   On November 3, 2000, Gould's consultant Mannik & Smith Group ("MSG") submitted the Work Plan for Soil Remediation at the property.  In its cover letter to MDEQ, MSG states:

> The interim Soil Remediation Work Plan is designed to focus strictly on the removal of VOC-impacted soils located in the northeast corner of the RSF property."  Previous investigations by MSG have identified this area as a possible source of VOC groundwater contamination... <u>With your approval</u>, MSG anticipates beginning the field portion of the soil remediation by November 15, 2000, providing we can coordinate site access with the current owner.

LCRC: 3.   After reviewing the soil remediation work plan, MDEQ approved the plan.  In a letter dated November 28, 2000, Rebecca Taylor of MDEQ stated: "The MDEQ <u>approves</u> of the above submitted revised work plan." (Emphasis added.)

LCRC: 4.   LCRC also relies on the supporting facts set forth in Defense No. 1 to Gould's CERCLA cost recovery claim.

Plaintiff contests Defendant's selective characterization of the "facts," as more fully set forth in the Plaintiff's Defenses section of this order below.

LCRC:     c.     **Authority for the Defense**

LCRC: The Michigan Court of Appeals in *Federated Ins. Co. v. Oakland County Rd Commission*, 263 Mich. App. 62; 687 N.W.2d 329 (2004); appeal dismissed, 475 Mich. 286; 715 N.W.2d 846 (2006) applied the six-year limitation period to bar a claim for response activity costs based on facts very similar to the instant case. In *Federated*, the plaintiff began construction on a soil remediation system in November of 1991 and submitted a remediation work plan to MDEQ which was approved in January of 1993. The road commission owned the adjacent property and in February of 1995 the MDEQ concluded that at least some of the contamination detected on plaintiff's property had migrated from the road commission property. The plaintiff filed its complaint on November 1, 2000, under NREPA for past and future remediation costs associated with releases occurring on the road commission property. The trial court granted summary disposition to the road commission and the Court of Appeals affirmed.

LCRC: In *Attorney General v. Woodland Oil Co.* (2001 Mich. App. LEXIS 1332 unpublished opinion), the State filed suit to recover its response activity costs at a site where petroleum products were released by defendants. In 1989 the defendants began the first of a three phase remedial action plan by excavating approximately 2,500 cubic yards of contaminated soil from the site. In 1991, the State took over the site from defendants and began phase two of the remedial action plan. The State filed its cost recovery action in 1997. The Court of Appeals held that the State's action was barred by the six year statute of limitations in MCL 324.20140(1)(a).

LCRC: 2.     **Gould Cannot Establish a Prima Facie Contribution Claim Under NREPA Because There was No Release or Threatened Release of a Hazardous Substance at the LCRC Facility Which Contributed to the TCE Plume Emanating from the Gould Facility.**

LCRC:     a.     **Elements of the Defense**

LCRC: M.C.L. 324.20129(3) provides that "a person may seek contribution from any other person who is liable under Section 20126..." Section 20126 provides that an owner or operator of a facility is liable if the owner or operator is responsible for an activity causing a release or threat of release. Since Gould cannot establish that there was a release or threat of release of hazardous substances from the LCRC facility which contributed to the TCB plume, Gould cannot establish a prima facie case for contribution under NREPA.

LCRC:     b.     **Supporting Facts**

LCRC: Please see supporting facts for Defense No. 2 to Gould's CERCLA cost recovery claim.

LCRC:     c.     **Authority for Defense**

24

2:17-cv-11130-MAG-DRG    Doc # 27-4    Filed 05/03/18    Pg 26 of 52    Pg ID 570
4:09-cv-12633-MAG-MJH    Doc # 147    Filed 05/25/12    Pg 28 of 137    Pg ID 3363

LCRC: Please see authority for Defense No. 2 to Gould's CERCLA cost recovery claim.

    C.    **LCRC's Counterclaims.**[8]

LCRC: 1.    **Count I – Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) Claim Pursuant to 42 U.S.C. § 9607(a).**

    LCRC:    a.    **Basic Elements of CERCLA Claim.**

LCRC: In order to make a *prima facie* case of CERCLA liability against Gould, LCRC must establish the following elements:

1.    There was a release or threatened release of a hazardous substance at the Gould facility;

2.    The site of the release or threatened release is a "facility";

3.    The release or threatened release has caused LCRC to incur response costs; and

4.    Gould is among a statutorily defined group of persons, which includes the owner or operator of a facility. 42 U.S.C. § 9607(a).

    LCRC:    b.    **Defendant's Supporting Facts.**[9]

LCRC: 1.    From at least 1961 until 1976 Gould, Inc. operated a piston and connecting rod manufacturing facility at 425 Roosevelt Street in Howell, Michigan. (The "Gould Facility") (Rich Dep., pp. 11-12)

LCRC: 2.    Gould used solvents including trichloroethylene ("TCE") to degrease the pistons and the solvents were contained in large dip tanks approximately four feet wide by eight feet long by four feet tall in the northeast corner of the factory building. (Galarneau Dep., pp. 21-23; MSG Drawing – Distribution of Soil Impacts)

LCRC: 3.    It was common practice at the Gould facility to dispose of spent solvents from the degreasing tanks onto the ground and into a "pond" on the east side of the facility. (Richardson Dep., pp. 29-31)  Spent solvents were dumped on the east side of the building so that employees would not have

---

[8] Based on the conference call with the Court held on April 20, 2012, LCRC has not included its common law counterclaims in the Joint Final Pretrial Order. However, pending the Court's ruling on the parties' motions for summary judgment, LCRC will reserve the right to assert these claims at trial.

[9] This is a complex environmental case and therefore it is not practical to include every fact in support of LCRC's counterclaims and defenses. Only the most pertinent facts have been included in the Joint Final Pretrial Order and additional facts will be presented by LCRC at trial.

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1244   Filed 05/14/19   Page 27 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 27 of 52   Pg ID 571
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 29 of 137   Pg ID 3364

to walk through the fluids and the ground would absorb the fluids. (Galarneau Dep., pp. 40-44, 85-87)

LCRC: 4.   Spent fluids from operations at the Gould facility were also disposed of by dumping five-gallon buckets of the fluids onto the property adjacent to the LCRC property and near the railroad tracks just northeast of the Gould site. (Galarneau Dep., pp. 41-43) For many years there were no tanks at the Gould facility for disposal of spent solvents and all solvents and other fluids from the factory were disposed of by dumping. (Galarneau Dep., p. 50)

LCRC: 5.   The saturated soil in the area of the Gould Facility where solvents were dumped has contained TCE concentrations in excess of 1 million ug/kg. (MSG Drawing – Distribution of Soil Impacts) TCE groundwater concentrations in this area are at or near the solubility of TCE in water and serve as a dense non-aqueous phase liquid (DNAPL) source for downgradient TCE groundwater contamination. (Feenstra Dep., pp. 117-125) TCE concentrations in the groundwater in this area have exceeded 1.5 million ug/L. (Feenstra Dep., p. 117)

LCRC: 6.   The tanks used for degreasing pistons in the factory building were drained using a spigot that fed into a drain inside the building. (Galarneau Dep., pp. 26-27) Fluids from the dipping tanks also dripped onto the floor of the building and into the floor drain. (Galarneau Dep., pp. 25-28) The floor drains flowed to the east wall of the Gould Facility and the pipe from the floor drain was connected and drained to a catch basin on the property boundary between the Gould site and the LCRC property. (MDEQ Photographs 17 and 18, dated March 7, 2001)

LCRC: 7.   It is estimated that thousands of gallons of solvents were disposed of at the Gould facility by dumping directly onto the ground and into floor drains. (Galarneau Dep., pp. 60-61)

LCRC: 8.   The area east of the Gould factory building where Gould dumped solvents sloped down towards the LCRC property at the time of the dumping. (1989 ASTI Report)

LCRC: 9.   High concentrations of TCE in the soil on LCRC property originated from the area of the Gould Facility where solvents were dumped. (Cok Dep. Vol. 1, pp. 33-34) Gould's dumping of TCE created a "halo" of residual soil impacts and the halo extended beneath the LCRC property. (Cok Dep. Vol. 1, pp. 33-34; Bolt Dep., pp. 65-67; Browning Dep., pp. 44-45) Saturated soil concentrations of TCE on the LCRC property within the "halo" created by Gould's dumping practices have exceeded 900,000 ug/kg. (MSG Summary of VAS Analytical Results)

26

LCRC: 10.   Substantial quantities of TCE were disposed of on the ground in the northeast corner of the Gould facility. (Feenstra Dep., pp. 43-44; Cok Dep., pp. 114-115) TCE dissolves in groundwater and migrates in the direction of groundwater flow. (Feenstra Dep., pp. 43-44)

LCRC: 11.   TCE-contaminated groundwater from the northeastern corner of the Gould Facility migrates in a northeast direction toward Thompson Lake and across the northwestern part of the LCRC property. (Cok Dep., Vol. 1, pp. 36-38; Feenstra Dep., pp. 42-43) TCE concentrations in the groundwater under the northwestern part of the LCRC property have exceeded 900,000 ug/L. (MSG Summary of VAS Analytical Results)

LCRC: 12.   DNAPL concentrations of TCE have never been located on the LCRC property. (Feenstra Dep., pp. 122-123)

LCRC: 13.   Twenty-nine LCRC employees have testified unequivocally that improper disposal of TCE or other hazardous substances never occurred on the LCRC property.

LCRC: 14.   Gould consultant Thomas Cok acknowledges that there is no evidence of disposal activity on the LCRC property. (Cok Dep., Vol. 2, p. 123) Dr. Feenstra acknowledges that he has no idea how TCE may have been released at the LCRC property and he agreed that any opinion he had on the subject would be "pure speculation." (Feenstra Dep., p. 125)

LCRC: 15.   TCE concentrations on the LCRC property resulting from Gould's dumping practices will migrate in the direction of groundwater flow. (Feenstra Opinion, p. 32) Groundwater flows from the Gould property to the contaminated parts of the LCRC property. (Stratus Report)

LCRC: 16.   The TCE lobe on the LCRC property is entirely consistent with the southeast component of groundwater flow from the Gould source area which has been noted on groundwater level maps since 1991. (Stratus Report, pp. 11-12)

LCRC: 17.   LCRC has incurred response costs in excess of $150,000 associated with sampling and monitoring the TCE contamination on its property resulting from Gould's operations.

**Plaintiff contests Defendant's selective characterization of the "facts," as more fully set forth in the Plaintiff's Defenses section of this order below.**

LCRC:   c.   <u>Authority for the CERCLA Cost Recovery Claim.</u>

LCRC: All of the elements of LCRC's CERCLA cost recovery claim are based on the liability section of the CERCLA statute. 42 U.S.C. § 9607(a). In a case such as

27

this involving the migration of contamination onto another site, the Sixth Circuit has described the causation standard as follows:

> In a "two site" case such as this, where hazardous substances are released at one sit and allegedly travel to a second site, <u>in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up.</u>

LCRC: *Kalamazoo River Study Group v. Rockwell International Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (emphasis added).

LCRC: Only those costs that "relate to activities that could be performed by engineers, chemists, private investigators, or other professionals who are not lawyers" are recoverable under CERCLA. *Village of Milford v. KH Holding Corp.*, 390 F.3d 926, 935 (quoting *Keytronic Corp.*, 511 U.S. at 819). The Sixth Circuit has held that attorney fees may be recovered only under the following circumstances:

> A CERCLA plaintiff may recover attorneys' fees if the activities for which the fees are incurred could have been performed by a non-attorney, are closely tied to an actual cleanup, are not related to litigation, and are otherwise necessary.

*Village of Milford*, 390 F.3d at 936.

LCRC: The responsive actions taken by plaintiff and the costs incurred must have been consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(B); 40 C.F.R. § 300.700(c)(3)(i). If the response activity is inconsistent with the NCP, then plaintiff is barred from recovering its response activity costs. *Sherwin William Co. v. City of Hamtramck*, 840 F. Supp. 470, 476 (E.D. Mich. 1993); *Pierson Sand & Gravel v. Pierson Twp*, 851 F. Supp. 850, 856 (W.D. Mich. 1994).

LCRC: 2.   **Count II – Contribution Claim Pursuant to NREPA**

    LCRC a.   **Elements of NREPA Contribution Claim.**

LCRC: M.C.L. 324.20129(3) provides that "a person may seek contribution from any other person who is liable under Section 20126 during or following a civil action brought under this part."

LCRC: Section 20126 provides that the following persons are liable:

    LCRC: (a)   The owner or operator of a facility if the owner or operator is responsible for an activity causing a release or threat of release.

LCRC: (b) The owner or operator of a facility at the time of disposal of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.

LCRC: "Response activity costs" or "costs of response activity" means all costs incurred in taking or conducting a response activity, including enforcement costs. M.C.L. 324.20101(qq). Part 201 defines "response activity" as follows: "The valuation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety or welfare, or the environment or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision or with the approval of, the Department of Community Health and enforcement actions related to any response activity."

LCRC: b. **Defendant's Supporting Facts.**

LCRC: Please see supporting facts for Count I.

LCRC: c. **Legal Authority.**

LCRC: The NREPA Part 201 cost recovery provision is patterned after CERCLA and is therefore construed in accordance with CERCLA. *ITT Industries v. Borg Warner, Inc.*, 700 F. Supp. 2d 848, 894 (W.D. Mich. 2010).

LCRC: The courts shall consider the following factors in allocating response activity costs in a contribution action:

LCRC: a. Each person's relative degree of responsibility in causing the release or threat of release.

LCRC: b. The principles of equity pertaining to contribution.

LCRC: c. The degree of involvement of and care exercised by the person with regard to the hazardous substance.

LCRC: d. The degree of cooperation by the person with federal, state or local officials to prevent, minimize, respond to, or remedy the release or threat of release.

LCRC: e. Whether equity requires that the liability of some of the persons should constitute a single share.

LCRC: M.C.L. 324.20129.

29

LCRC: 3.    COUNT III – Cost Recovery Under Part 201 of NREPA.

    LCRC: a.    Elements of Cost Recovery Under Part 201 of NREPA.

LCRC: The elements of a cost recovery claim under NREPA are similar to the elements of a cost recovery claim under CERCLA:

    LCRC: 1.    Gould was responsible for an activity causing a release at the Gould facility;

    LCRC: 2.    The site of the release or threatened release is a "facility";

    LCRC: 3.    The release or threatened release has caused LCRC to reasonably incur response activity costs; and

    LCRC: 4.    Gould is among a statutorily defined group of persons, which includes the owner or operator of a facility.

LCRC: M.C.L. 324.20126(a); M.C.L. 324.20126.

    LCRC: b.    Defendant's Supporting Facts.

LCRC: Please see supporting facts for Count I.

    LCRC: c.    Authority for the NREPA Cost Recovery Claim.

LCRC: The NREPA Part 201 cost recovery provision is patterned after CERCLA and is therefore construed in accordance with CERCLA. *ITT Industries v. Borg Warner, Inc.*, 700 F. Supp. 2d 848, 894 (W.D. Mich. 2010). The analysis of a cost recovery claim under NREPA is nearly identical to the analysis of a cost recovery claim under CERCLA. *Saline River Props, LLC v. Johnson Controls, Inc.*, 2011 U.S. Dist. LEXIS 119516, 44 (E.D. Mich. 2011).

    D.    Plaintiff's Defenses.    Plaintiff contests the majority of the "facts" selectively asserted by Defendant both in support if its defenses and in support of it counterclaims. The lack of support for many of Defendant's asserted "facts" was previously addressed in the parties' motion briefing, most notably in the Counter-Statement of Material Facts section of Plaintiff's Brief in Response to the Livingston County Road Commission's Motion for Summary Judgment. (Dkt 116).    The parties previously briefed and argued before the Court Defendant's defense arguments that Plaintiff has failed to plead prima facie claims and failed to comply with the NCP

by failing to obtain public comment. Plaintiff's environmental response activities have been conducted pursuant to the request of the MDEQ, and the MDEQ generally does not seek public comment in accordance with the NCP until it has selected and desires to implement a recommended permanent remedial action plan, which it has not done yet. (Taylor Declaration, ¶12). Defendant has ignored the Court's stated inclination to deny Defendant's motions as not well grounded.

In response to Defendant's asserted facts supporting it defenses and claims, Plaintiff notes the following salient facts:

1.   Defendant Livingston County Road Commission (the "LCRC" or "Defendant") was the owner and operator of the property at 918 North Street, Howell, Michigan (the "LCRC Property," also referred to in certain exhibits as the "LCRC Site") from 1933 until 2002, and it has been the owner and operator of that property from 2011 to the present.

2.   Defendant conducted its road operations from the LCRC Property from 1933 until 1990.

3.   Defendant used solvent that may have contained trichloroethylene ("TCE") in one or two parts washers in its vehicle maintenance operations on the LCRC Property from at least the 1970s to 1990. (LCRC/Ever-Clean Uniform Hazardous Waste Manifest and Criteria Form).

4.   Defendant has not produced any documentation to indicate the concentrations of TCE that were contained in the waste from the parts washers on the LCRC Property.

5.   Defendant purchased choke and carburetor cleaner in 1984 along with servicing of its parts washer from a supplier named Safety-Kleen, which also offered brake cleaner for sale. (Feenstra Report, p. 18).[10] It is not known if Defendant purchased such products at other

---

[10]   Plaintiff has included citations to the report of its expert, Stanley Feenstra, which report often included citations to further evidentiary support.

time because sales records are not available. Products such as choke and carburetor cleaner and brake cleaner may have contained chlorinated solvents such as TCE. (*Id.*)

6.    Former employees from an industrial site at 409 Roosevelt Street adjacent to the LCRC Property were interviewed in 1994 and provided some information regarding what appeared to be the disposal of oils from truck washing and oil changes and antifreeze by Defendant's employees near a trench on the LCRC Property and into a common drain shared between the northeast corner of the Former Gould Property and northwest corner of the LCRC Property that flowed northerly to Thompson Lake. (Feenstra Report, p. 17).

7.    Defendant produced some general expense records for the LCRC Property during the 1950s, but Defendant failed to produce similar records for the 1960s, 1970s or 1980s. Although not highly specific in the nature of material purchases, those records indicate Defendant's use of solvents during that early time period. (Feenstra Report, p. 19).

8.    An entry in Defendant's expense records for May 18, 1956 indicates a purchase of of carbon tetrachloride, which was commonly used at the time for parts cleaning and degreasing. Based on the value of the purchase, the quantity purchased was approximately 1,000 lbs. During the 1950s and thereafter, the use of carbon tetrachloride for parts cleaning and degreasing was supplanted by the use of TCE. (Feenstra Report, pp. 19-20).

9.    Despite previous denials over a number of years, Defendant has been forced by this litigation to admit that it used bulk TCE on the LCRC Property for asphalt testing in its road operations from at least 1971 until the late-1980s when the test procedures required by the Michigan Department of Transportation were changed from TCE to another substance. (Feenstra Report, pp. 16-22; Little Dep., pp. 8-19; Marr Dep., pp. 11-18; Craine Dep., pp. 65-66, 106, 112, 123-124).

10.    Defendant has no records of the disposal of spent TCE from its asphalt bituminous testing.

11.    The two witnesses who have personal knowledge of Defendant's use of TCE in asphalt bituminous testing, Frederick Marr and Eric Little, have no personal knowledge regarding the ultimate disposal of the spent TCE.  (Little Dep., pp. 14, 19; Marr Dep., pp. 12-13, 15, 16).

12.    Safety-Kleen Systems, Inc., a company that provided Defendant with solvents from time to time, has no records of picking up spent TCE from asphalt bituminous testing at the LCRC Property at any time. (Ross Dep., pp. 8-9, 51-54).

13.    Defendant has no records establishing the frequency of asphalt bituminous testing during the 1950s, 1960s, 1970s or 1980s.

14.    Defendant used approximately one quart of TCE per asphalt bituminous test it conducted on the LCRC Property.

15.    Defendant ceased using TCE in its asphalt bituminous testing in the late 1980s when the testing procedures required by Michigan Department of Transportation were changed to use another solvent.

16.    Defendant's practice during at least a part of the time it conducted TCE asphalt bituminous testing was to transfer the spent TCE into a five gallon container near the testing apparatus which, when it became approximately one-half full, was then emptied into a larger drum.

17.    No witnesses have any personal knowledge regarding the ultimate fate of the spent TCE placed into the larger drum.

33

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1252   Filed 05/14/19   Page 35 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 35 of 52   Pg ID 579
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 37 of 137   Pg ID 3372

18.    Despite Defendant's awareness of TCE contamination on the LCRC Property, Defendant obtained a written fair market value appraisal of the LCRC Property of $415,000 in June 1997 based on the assumption that the property was not negatively affected by environmental contamination. (6/27/97 Market Value Appraisal Summary Report).

19.    Despite Defendant's continuing awareness of TCE contamination on the LCRC Property, Defendant obtained a written update of its previous fair market value appraisal of the LCRC Property in January 2001 that established that the fair market value was $450,000 assuming no environmental contamination. (1/29/01 Market Value Appraisal Update).

20.    Prior to Livingston County's purchase of the LCRC Property in 2002, it secured a Baseline Environmental Assessment ("BEA") which was designed to identify existing environmental conditions on the LCRC Property (9/24/01 Livingston County memo), noted "contamination extending onto" the LCRC Property (12/02/01 BEA, p. 5), and identified TCE as one of the contaminants on the LCRC Property. (Id., pp. 10, 11, 14).

21.    Defendant sold the LCRC Property "as is" to Livingston County in April 2002 for the fair market value, assuming no environmental contamination, of $450,000 established by Defendant's previously updated appraisal. (8/2/07 Land Contract, Warranty Deed and Purchase Agreement).

22.    Despite Defendant's continuing awareness of TCE contamination on the LCRC Property, Defendant reacquired the LCRC Property from Livingston County for $65,000 in 2011.

23.    Gould Inc. was the owner and operator of a piston and associated parts manufacturing plant on a parcel of property adjacent to the LCRC Property located at 325 N.

34

Roosevelt Street, Howell, Michigan (the "Former Gould Property," also referred to in certain exhibits as the "RSF Site"), from 1961 to 1976.

24.    The Former Gould Property has had various owners since Gould Inc. ceased its operations on the property in 1976, including Glover Electric, Howell Plastics, Michigan National Bank, Ms. Gloria Neville, and North Roosevelt, LLC.

25.    Gould Inc. used solvents to degrease piston parts in a tank located in the northeast corner of the manufacturing building on the Former Gould Property.

26.    Mr. Galarneau testified that he did not know what chemical was in the tank and had never heard of TCE. (Galarneau Dep, pp. 33 & 63).

27.    Mr. Richardson testified that one of the chemicals used in the tank was carbon tetrachloride, which is different from TCE. (Richardson Dep., p. 21). Mr. Richardson never worked the dipping tank or disposed of any solvent from that tank. (Exhibit 29, Richardson Dep., p. 37).

28.    Although Mr. Galarneau testified that the tank had a spigot for draining, he never testified that he actually drained the tank. To the contrary, he testified that he "never really had that much to do with the tank," and that he only occasionally used the tank when he had nothing else to do. (Galarneau Dep., pp. 25, 36, 46 & 84). He never participated in cleaning the tank or even ever saw it cleaned. (Id. at 82).

29.    Mr. Richardson testified that he never saw the spigot used or the tank emptied. (Richardson Dep., p. 35).

30.    Mr. Blevins also testified that he never saw the spigot used. (Blevins Dep., p. 38). He testified that there was very little degreaser left in the dipping tank by the time all of the

35

parts were washed, due in part to evaporation, and that degreaser solution had to be added to the tank. (*Id.* at 30-31).

31.    Mr. Galarneau testified that he was not sure how many gallons of "stuff" were thrown on the ground or in the drains, although he later agreed with defense counsel's suggestion that it could be thousands of gallons over the years. (Galarneau Dep., pp. 60-61). Significantly, Mr. Galarneau's testimony related to innocuous coolant and not TCE, which is the contaminant of concern in this lawsuit.

32.    Defendant fails to distinguish between the two different forms of fluid utilized by Gould Inc. One form of fluid was a solvent used to degrease parts in a dipping tank, which fluid neither Mr. Galarneau nor Mr. Richardson identified as containing TCE. The other form of fluid utilized by Gould Inc. was a lubricating coolant used in the grinding and lathe machines in the shop. Both Mr. Richardson, who mixed the coolant, and a foreman, Mr. Blevins, identified that coolant as consisting of cutting oil, kerosene, a sweetening disinfectant and water. (Exhibit 29, Richardson Dep., pp. 24-26; Exhibit 38, Blevins Dep., pp. 20-21). None of the gentlemen identified TCE as a component of the coolant. To the contrary, Mr. Richardson testified that it would not make sense to use any kind of degreaser in the coolant, which served as a lubricant for the machine parts. (Richardson Dep., p. 51).

33.    Mr. Galarneau testified that he dumped liquids from the machines, i.e. coolant, anywhere on the property that was out of the way, including in the pond, to the east of the building, and behind the building closer to the railroad tracks. (Galarneau Dep., pp. 40-43 & 85). Mr. Galarneau referenced five-gallon buckets to dump the coolant from the lathes in the scrap chip room. (Galarneau Dep., pp. 35-38). This coolant material was not a source of TCE.

34.     Mr. Richardson testified that he never even went onto the small strip of property outside the east end of the building, and that the only place where fluids were dumped was in the pond (and in the scrap chip room, which is not relevant to this lawsuit).  (Richardson Dep., pp. 36 & 41).

35.     Much of Gould Inc.'s spent coolant was dumped in an area referred to as the "pond" on the east side of the Former Gould Property.  (Richardson Dep., pp. 29-30).

36.     The pond area on the Former Gould Property is depicted on the parties' various engineering drawings as being within a large hatched vertical rectangular area, which is where contaminated soils were removed in 1988 or 1989 at the direction of Michigan National Bank.  (Cok Declaration, ¶8).

37.     Defendant's expert, Dr. John T. Lehman, agreed that the pond area was the repository for most liquid industrial waste generated by Gould Inc.  (Lehman Dep., p. 29).

38.     The pond area on the Former Gould Property has never been found to have significant TCE contamination.  (Cok Declaration, ¶8).

39.     In 1988 or 1989, Michigan National Bank conducted an interim response activity on the Former Gould Property that included the excavation of approximately 2,474 yards of soil from the pond area.  (Feenstra Report, p. 11; 1989 ASTI Report, p. 13).

40.     The 1988-1989 environmental investigation on the Former Gould Property did not discover any TCE wastes or subsurface contamination by TCE.  (Feenstra Report, p. 11).

41.     In March of 1995, Plaintiff reimbursed Michigan National Bank $195,000 for the cost of the previous interim soil removal in 1988.  (Settlement Agreement).

42.     TCE is referred to as a volatile organic compound ("VOC") because it has a high vapor pressure and can evaporate readily into the air.  (Feenstra Report, p. 25).

43.    TCE has been widely used for degreasing operations since the 1920s. (Feenstra Report, p. 22).

44.    Both the Manufacturing Chemists Association of the United States in its Chemical Safety Data Sheet for TCE adopted in the 1940s and The Dow Chemical Company in its Material Safety Data Sheet for TCE issued in 1971 recommended disposing of TCE by pouring it on the ground a safe distance away from inhabited buildings and allowing it to evaporate into the atmosphere. (Feenstra Report, p. 23).

45.    Prior to establishment of hazardous waste disposal regulations under RCRA in 1980, disposing of spent or waste TCE on the ground away from inhabited structures was a common industry practice.   (Feenstra Report, pp. 22-24; Lehman Dep., pp. 90-91; Peach Dep., p. 43).

46.    Prior to establishment of hazardous waste disposal regulations under RCRA in 1980, the commonly accepted roadbuilding industry method of disposing of spent TCE from asphalt bituminous testing was to dispose of the TCE on the ground. (Upston initial affidavit, ¶¶ 2, 6; Upston second affidavit, ¶¶ 6, 7, 10).

48.    It was not generally recognized in the scientific, engineering or regulatory communities that disposal or spills of chlorinated solvents such as TCE onto the ground could cause significant groundwater contamination until the late 1970s and early 1980s. (Feenstra Report, p. 22).

49.    Defendant's environmental consultant, Groundwater Technology, Inc. ("GTI"), detected TCE in groundwater on the LCRC Property in the late 1980s and informed Defendant of the importance of defining the extent of the TCE impact. (GTI's Summary of Activities; GTEL Environmental Laboratories, Inc.'s 1/17/90 lab report).

38

49.    The Michigan Department of Environmental Quality ("MDEQ") identified Gould Inc. in December 1993 as a potentially responsible person for groundwater contamination on the Former Gould Property. (12/7/93 MDEQ letter to Gould Inc.).

50.    Plaintiff agreed in January 1994 to cooperate with the MDEQ with requested environmental investigation and response activities on the Former Gould Property. (1/21/94 Plaintiff letter to MDEQ).

51.    Plaintiff has worked in cooperation with the MDEQ to investigate and respond to the contamination, and the MDEQ has been satisfied with Plaintiff's response activities. (Taylor Declaration).

52.    Pursuant to the MDEQ's request in 1995, Plaintiff's consultants conducted an investigation to verify the effectiveness of the previous soil removal work on the Former Gould Property completed on behalf of Michigan National Bank in 1989. No TCE was detected in any of the shallow soil samples. (Feenstra Report, p. 12).

53.    Pursuant to the MDEQ's request in 1996, Plaintiff's consultants conducted further verification investigation at the north end of the soil removal areas in the southeastern portion of the Former Gould Property. No TCE was found in any of the soil samples or in a groundwater sample, although a low concentration of vinyl chloride, a degradation product of TCE, was found in the groundwater sample. (Feenstra Report, p. 12)

54.    Pursuant to the MDEQ's request in 1998, Plaintiff's consultants conducted another round of groundwater monitoring and investigation on the Former Gould Property and adjacent LCRC Property. High concentrations of TCE were found in monitoring wells where the northeast corner of the Former Gould Property meets the northwest corner of the LCRC Property. (Feenstra Report, pp. 12-13).

39

55.     Pursuant to the MDEQ's request in 1999, Plaintiff's consultants began delineating the TCE plume and investigating the source of the TCE found in groundwater at the northeast corner of the Former Gould Property.  (Feenstra Report, p. 13).

56.     Pursuant to the MDEQ's request in 2000 for further delineation of the extent of the TCE contamination and for an interim soil remediation of the contamination in the northeastern portion of the Former Gould Property, Plaintiff's consultants conducted an interim response activity on the Former Gould Property that included the excavation of approximately 464 cubic yards of soil in 2001 from the area depicted on the parties' various engineering drawings as being within a small hatched square area immediately to the east of the manufacturing building.  (Feenstra Report, p. 13; Interim Soil Remediation Workplan; Cok Declaration, ¶5; Taylor Declaration, ¶¶9 & 10).

57.     Defendant ignores the fact that the 2001 soil removal work was done as an "interim" response, as denominated at the time and testified to by Plaintiff's consultants and the MDEQ.  (Cok Declaration, ¶5; Taylor Declaration, ¶¶9 & 10).

58.     Pursuant to the MDEQ's  same request in 2000, Plaintiff's consultants conducted a substantial program in 2003 and 2004 to delineate the TCE plume off site from the Former Gould Property.  High concentrations of TCE were found in vadose zone soils (i.e., soils above the water table) and groundwater zone soils and in groundwater on both the Former Gould Property and the LCRC Property, extending off site to the north towards Thompson Lake. (Feenstra Report, p. 14).

59.     Based on their investigations, Plaintiff's consultants concluded that some of the TCE originated from the LCRC Property, in addition to from the Former Gould Property.

60.     Based of the investigations requested by the MDEQ, the MDEQ agreed that "LCRC may also be a source for TCE contamination," and that there was "plume migration from both" the Former Gould Property and LCRC Property. (Feenstra Report, p. 14).

61.     Following further investigation of the TCE contamination requested by the MDEQ, the MDEQ continued to opine in 2006 that the LCRC "appears to be contributing to the TCE groundwater contamination" and that "the DEQ agrees that LCRC appears to have contributed TCE to the groundwater." (Feenstra Report, pp. 14-15).

62.     On August 2, 2007, the MDEQ identified the LCRC Property as a "facility," notified the LCRC of the MDEQ's conclusion that releases of the hazardous substances TCE had occurred on the LCRC Property, notified Defendant that it is "responsible" for TCE contamination on the LCRC Property, and requested a work plan from Defendant to address the problem by December 7, 2007. (8/2/07 MDEQ letter to Defendant).

63.     The MDEQ agreed with the conclusion of Plaintiff's consultants that there is a TCE plume on the LCRC Property contributing to the groundwater contamination. (8/2/07 MDEQ letter to Defendant).

64.     Since being identified by the MDEQ in 2007 as a potentially responsible person for TCE contamination, Defendant has failed to respond to the contamination to the satisfaction of the MDEQ or proposed the work plan requested by the MDEQ.

65.     On November 18, 2009 and January 12, 2010, the MDEQ wrote Defendant again requesting a work plan "that addresses releases of the known hazardous substances" at the LCRC Property.

66.     On February 8, 2012, the MDEQ wrote Defendant's attorney regarding Defendant's failure to conduct sufficient site investigation and response activities and to repeat

41

the MDEQ's request for work tasks that the MDEQ previously had requested of Defendant in
2007. (2/8/12 MDEQ letter to Defendant).

      67.    Plaintiff's consultants conducted additional investigations in 2008 for
development of a feasibility study and proposed remedial action plan for the TCE contamination.
(Feenstra Report, p. 15).

      68.    Plaintiff's consultants completed preparation of the feasibility study and
conceptual remedial action plan to remediate the TCE found on the Former Gould Property,
LCRC Property and the off-site areas in 2010. (Feenstra Report, p. 15).

      69.    Although Plaintiff's consultants presented their feasibility study and remedial
action plan to the MDEQ for consideration, the MDEQ has not yet completed its evaluation or
selected which final remediation plan it wishes to have implemented. (Taylor Declaration).

      70.    Plaintiff's expert witness, Dr. Stanley Feenstra, is the recognized leading expert
regarding the history of TCE use and its characteristics when disposed of on the ground.

      71.    The TCE-contaminated groundwater at issue in this lawsuit consists of two
separate plumes, with one plume originating in the northeastern corner of the Former Gould
Property and migrating in a north/northeasterly direction, and the other separate plume
originating on the LCRC Property and migrating in a north/northwesterly direction and merging
into the other TCE groundwater plume, toward Thompson Lake.

      72.    The majority of the TCE on the LCRC Property cannot be explained by TCE
contamination emanating from the Former Gould Property due to the geology and hydrogeology
of the area in question. (MDEQ Notice Letter, August 2, 2007; MSG TCE Isoconcentration
Map; MSG's 11/1/05 Supplemental TCE Investigation Report, p. 21; Feenstra Report, pp. 33-35;
Taylor Declaration, ¶4).

73.    It is probable that most of the TCE contamination on the LCRC Property originated from releases of TCE on the LCRC Property, as opposed to releases of TCE on the Former Gould Property. (Feenstra Report, pp. 5 & 36).

74.    TCE in its pure form (i.e., unused), and in the form of spent or waste solvent from industrial processes, is a dense non-aqueous phase liquid ("DNAPL). (Feenstra Report, p. 24)

75.    DNAPLs will not dissolve readily in water and have a density greater than water. (Feenstra Report, p. 24).

76.    Because DNAPL TCE will not dissolve readily in water and is much more dense than water, it will migrate downward into the subsurface environment as a separate liquid phase, and its migration path will not be controlled by groundwater flow. Instead, migration of DNAPL TCE will be controlled primarily by the nature and structure of the geologic materials in the subsurface, such as the presence and orientation of lower-permeability layers. (Feenstra Report, p. 24).

77.    As DNAPL TCE migrates through the subsurface, a portion of its volume is retained by capillary forces in the pores of the soil referred to as residual DNAPL, thus leaving a trail of DNAPL-contaminated soil. (Feenstra Report, pp. 24-25).

78.    If the migrating DNAPL encounters a lower-permeability layer such as silt or clay, it may accumulate as a puddle of potentially mobile DNAPL, or continue to migrate laterally if the lower-permeability layer is sloped downward. (Feenstra Report, p. 25).

79.    Soil water (i.e., in the vadose zone above the water table) or groundwater that comes into contact with DNAPL TCE in the subsurface will dissolve a portion of the DNAPL and acquire concentrations of dissolved TCE, which will migrate through the subsurface with migration of the soil water and groundwater. (Feenstra Report, p. 25)

43

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1262   Filed 05/14/19   Page 45 of 50

2:17-cv-11130-MAG-DRG   Doc # 27-4   Filed 05/03/18   Pg 45 of 52   Pg ID 589
4:09-cv-12633-MAG-MJH   Doc # 147   Filed 05/25/12   Pg 47 of 137   Pg ID 3382

80.     The zones of the subsurface that contain residual or puddle DNAPL TCE are the principal sources of the resultant groundwater contamination. (Feenstra Report, p. 25)

81.     If DNAPL TCE or dissolved TCE in soil water is present in the vadose zone above the water table, a portion of the TCE in these phases will vaporize into the soil air. TCE vapor in soil air may migrate through the soil laterally and vertically away from the DNAPL TCE or dissolved TCE zones. (Feenstra Report, p. 25).

82.     Because zones of residual and accumulated DNAPL TCE represent a persistent source of the dissolved TCE contamination to the groundwater, identification and delineation of such DNAPL source zones is an important element of site characterization studies and design of remedial actions. (Feenstra Report, pp. 25-26).

83.     At most sites of TCE contamination, any DNAPL accumulations that may be present are small, thin and not frequently intersected by soil borings or monitoring wells so that mobile DNAPL TCE (commonly referred to as free-product) is seldom encountered directly.  At most sites, the presence and locations of DNAPL in the subsurface must be inferred from the chemical analysis of groundwater, soil, or soil gas. (Feenstra Report, p. 26).

84.     A method for calculating a threshold soil concentration for TCE, also referred to as a soil saturation concentration above which DNAPL TCE must be present in the soil, was first described by S. Feenstra, D. Mackay and J. Cherry in 1991, was adopted by the United States Environmental Protection Agency in 1992 for assessment of DNAPL at Superfund sites, and also has been used by state agencies such as the MDEQ. (Feenstra Report, p. 26).

85.     Screening of vapor concentrations in soil samples using a portable organic vapor analyzer such as a photo-ionization detector ("PID") was performed for most of the soil borings

44

Case 2:17-cv-11130-MAG-DRG    ECF No. 45-2, PageID.1263    Filed 05/14/19    Page 46 of 50

2:17-cv-11130-MAG-DRG    Doc # 27-4    Filed 05/03/18    Pg 46 of 52    Pg ID 590
4:09-cv-12633-MAG-MJH    Doc # 147    Filed 05/25/12    Pg 48 of 137    Pg ID 3383

completed by Plaintiff's consultants at the Former Gould Property and LCRC Property.
(Feenstra Report, p. 27).

86.    Based on Stanley Feenstra's personal experience with investigations at more than
200 sites of groundwater contamination by chlorinated solvents such as TCE, and a set of
published laboratory studies, PID readings of about 100 ppmv or greater usually indicate the
presence of DNAPL source material or very high groundwater concentrations. (Feenstra Report,
p. 27).

87.    Defendant's characterization of Dr. Feenstra's testimony is false. When asked
whether "we've never found DNAPL concentrations on the Road Commission Property?," Dr.
Feenstra answered, "Well, I believe you have." Further, Dr. Feenstra explained that "the
magnitude to the concentrations found in the groundwater and in some of the saturated soil
samples indicate the presence of DNAPL at those locations." (Feenstra Dep., pp. 122-123). Dr.
Feenstra's report notes that DNAPL TCE "must be in close proximity" to sampled area on the
LCRC Property. (Feenstra Report, pp. 30-31).

88.    The subsurface beneath the Former Gould Property and LCRC Property consists
principally of sand and fine sand deposits interbedded with layers of silty clay. The water table
occurs at 5 to 10 feet below ground surface. (Feenstra Report, p. 27).

89.    As a result of its studies of the subsurface of the Former Gould Property and
LCRC Property, Plaintiff's consultant, Mannik & Smith Group, Inc. (MSG"), has characterized
an upper unconfined aquifer zone, referred to as S1, with three sub-divisions: S1a, S1b and S1c,
depending on their position relative to the interbedded silty clay units. A deeper confined sand
aquifer has two units, referred to as S2a and S2b. The S2 aquifer zone is confined by a silty clay
layer, referred to by MSG as the "Basal Clay," which appears to be continuous in the area of the

45

Former Gould Property and LCRC Property. There are various silty clay layers interbedded within the unconfined S1 aquifer, most of which are discontinuous, but one referred to by MSG as the "Intermediate Clay Lens" appears to be continuous in the key area of the northeast corner of the Former Gould Property and the northwest corner of the LCRC Property. (Feenstra Report, p. 27).

90.    DNAPL TCE released at the northwest corner of the Former Could Property appears to have migrated vertically downward and accumulated in the low area on top of the Intermediate Clay Lens, within about 20 feet of the entry area. (Feenstra Report, pp. 5 & 31).

91.    Groundwater contaminated by contact with DNAPL TCE beneath the entry area on the Former Gould Property will migrate with groundwater flow generally to the north. (Feenstra Report, p. 34).

92.    A subterranean Intermediate Clay Lens slopes upward from the Former Gould Property onto the LCRC Property by as much as 10 feet, such that it is highly improbable that DNAPL TCE could migrate up this slope from the Former Gould Property to cause the contamination found on the LCRC Property. (Feenstra Report, pp. 5 & 32-35).

93.    Defendant's former geologist, Stephen Peach, acknowledges that TCE sinks and, when it encounters a clay layer that is locally contiguous, it would tend to move down the clay layer in the direction in which the top of the clay layer trends. (Peach Dep., pp. 25-26).

94.    The pattern of groundwater flow at the northeast corner of the Former Gould Property and the northwest corner of the LCRC Property is such that TCE-contaminated groundwater from the Former Gould Property would not migrate onto the LCRC Property to cause the contamination found on the LCRC Property. (Feenstra Report, p. 35).

95.     Groundwater elevation measurements taken in monitoring wells on the Former Gould Property and LCRC Property on 5 dates during 2005 to 2007 show that the groundwater flow in the zone on top of the Intermediate Clay Lens, where TCE concentrations are the highest, is not directed onto the LCRC Property from the Former Gould Property. (Feenstra Report, p. 32).

96.     Based on the slope of the Intermediate Clay Lens, the pattern of groundwater flow, and the locations of high levels of TCE contamination on the LCRC Property, the most probable area of entry of DNAPL TCE into the subsurface to account for the TCE contamination on the LCRC Property is the area south of the site marked as "B-124" and west or southwest of the site marked as "B-123" on MSG's drawings. (Feenstra Report, pp. 35-36).

97.     Preliminary results from the 2010 and 2012 site investigations by Defendant's consultant corroborate the findings of Plaintiff's consultant.

98.     The LCRC Property is a "facility" within the meaning of 42 U.S.C. §9601(9) and MCL 324.20101(r), in that it is a site, area, place or property where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

99.     There has been a "release" or threatened "release" of a hazardous substance on the LCRC Property, within the meaning of 42 U.S.C. §9601(22), in that a hazardous substance has been spilled, leaked, pumped, poured, emitted, emptied, discharged, injected, escaped, dumped or disposed into the environment (the "LCRC Release").

100.    The LCRC Release has caused the Plaintiff to incur necessary costs of response.

101.    The LCRC Release has caused the Plaintiff reasonably to incur costs of response.

47

Case 2:17-cv-11130-MAG-DRG   ECF No. 45-2, PageID.1266   Filed 05/14/19   Page 49 of 50

2:17-cv-11130-MAG-DRG    Doc # 27-4    Filed 05/03/18    Pg 49 of 52    Pg ID 593
4:09-cv-12633-MAG-MJH    Doc # 147    Filed 05/25/12    Pg 51 of 137    Pg ID 3386

102.   Plaintiff has spent $1,643,991.35 on non-legal expenses and $237,303.19 on legal expenses through September 28, 2011 on investigating and responding to the releases of TCE on the Former Gould Property and the LCRC Property.

103.   Although Plaintiff has funded all of the environmental response activities itself to date, Plaintiff put Defendant on notice in as early as 1994 of Plaintiff's right and intent to recover response costs from other potentially responsible persons such as Defendant.  (6/23/94 & 8/12/94 letters from Plaintiff's counsel to Defendant's counsel).

104.   Plaintiff provided Defendant with a proposed environmental work plan for the Former Gould Property in June 1994 and repeated its previous request for access to wells on the LCRC Property.  (6/23/94 letter from Plaintiff's counsel to Defendant's counsel).

105.   Plaintiff updated Defendant in August 1994 regarding the environmental response activity on the Former Gould Property and requested detailed information regarding Defendant's practices on the LCRC Property, but Defendant never supplied any of the requested information prior to this litigation. (8/12/94 Plaintiff's counsel's letter to Defendant's counsel).

106.   The environmental investigation and work by Plaintiff and its consultants relating to the contamination at issue was performed at the specific request of the MDEQ and in accordance with the requirements of the MDEQ's regulations.  (Taylor Declaration; Feenstra Report, p. 6).

107.   The scope of the environmental investigation and work by Plaintiff and its consultants at the Former Gould Property was commensurate with the conditions at the site and the requirements of MDEQ.  (Taylor Declaration; Feenstra Report, pp. 36-37).

108.   The work done by Gould and its consultants to investigate and respond to the subsurface contamination on the Former Gould Property, LCRC Property and adjacent lands has

48

been well executed and necessary response activities according to the CERCLA and MDEQ's requirements and standard industry practices.  (Taylor Declaration; Feenstra Report, pp. 36-37).

109.    The MDEQ is still evaluating a number of different potential remediation plans submitted by Plaintiff's consultants and has not selected a remediation plan for the Former Gould Property yet.  (Taylor Declaration, ¶11).

**E.    Plaintiff's Damages.**  Plaintiff has incurred substantial interim response costs totaling in excess of $1,880,000, including in excess of $1,643,990 for technical environmental services and in excess of $240,000 for recoverable investigatory legal costs and expenses, with respect to environmental work involving the TCE contamination at the properties at issue in Howell, Michigan.  Although the MDEQ has not selected a remediation plan yet, Plaintiff currently anticipates the need for additional future costs of approximately $2,300,000 through 2020 to remediate the TCE contamination arising from both properties.  Plaintiff seeks a monetary judgment for Defendant's responsible share of the environmental costs Plaintiff has incurred to date and a declaratory judgment establishing Defendant's liability for its continuing responsible share of future environmental costs.

**F.    Defendant's Damages.** [11]

LCRC has incurred response activity costs in excess of $150,000 associated with sampling and monitoring the TCE contamination on its property resulting from Gould's operations.

---

[11] Based on the telephone conference held with the Court on April 20, 2012, LCRC has not included damage claims based on its common law counterclaims in the Joint Final Pretrial Order.  However, pending the Court's ruling on the parties' motions for summary judgment, LCRC reserves the right to present these damage claims at trial.