UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GOULD ELECTRONICS INC.,

       Plaintiff,                                       Case No. 17-11130

vs.                                               HON. MARK A. GOLDSMITH

LIVINGSTON COUNTY ROAD
COMMISSION,

       Defendant.
_____/

## OPINION & ORDER
## DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 90)
## AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 86)

This matter is before the Court on Plaintiff Gould Electronics Inc.'s ("Gould") motion for partial summary judgment (Dkt. 90) and Defendant Livingston County Road Commission's ("LCRC") motion for summary judgment (Dkt. 86). Both motions have been fully briefed. Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons discussed below, the Court denies both motions.

## I.    BACKGROUND

Gould initiated this environmental contamination case against LCRC on July 6, 2009. Gould Electronics, Inc. v. Livingston Cty. Rd. Comm'n, No. 09-cv-12633 (E.D. Mich.) (the "prior action"). In short, the case concerned the "determination of responsibility for costs associated with the cleanup and remediation of trichloroethylene ('TCE') contamination on two adjacent parcels of real property and the surrounding area," located in Howell, Michigan. Gould Electronics, Inc. v. Livingston Cty. Rd. Comm'n, No. 09-cv-12633, 2012 WL 5817937, at *1 (E.D. Mich. May 25,

2012).  One of the parcels is owned by LCRC (the "LCRC Property"), and Gould is indisputably responsible for liabilities arising from an adjoining parcel (the "Gould Property").  Id.  Gould admits that it is partially responsible for the contamination of soil and groundwater, but alleges that LCRC shares responsibility for the contamination.  Id.  LCRC, however, contends that Gould is fully responsible.  Id.

On May 29, 2012, the parties stipulated to an order of dismissal without prejudice in the prior action, in accordance with a tolling agreement entered into by the parties on May 21, 2012 (the "Tolling Agreement").  See Stip. Order of Dismissal, Ex. A to Am. Compl. (Dkt. 22-2).  The order of dismissal provided that either party could revive the surviving claims by filing a complaint initiating a new action.  Id. ¶ 2.  The order of dismissal also provided that in the event a new action was initiated "the current record, pleadings, Joint Final Pretrial Order, discovery, expert reports, legal positions of the parties, etc. in this lawsuit shall be preserved as applicable and binding," while discovery would be limited to new data gathered regarding the contamination.  Id. ¶ 4.

Gould initiated the present case on April 11, 2017, and filed its most recent amended complaint on October 8, 2019, in which it asserted claims for (1) cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and (2) contribution under Michigan's Natural Resources and Environmental Protection Act ("NREPA"), Mich. Comp. Laws § 324.20129.  See 3d Am. Compl. (Dkt. 76).  However, Gould has agreed to voluntarily dismiss its NREPA contribution claim.  Pl. Resp. at 25 (Dkt. 100).

LCRC filed a counter-complaint on July 15, 2019, in which it brought counterclaims against Gould for (1) cost recovery under CERCLA, (2) contribution under NREPA, and (3) cost recovery under NREPA, Mich. Comp. Laws § 324.20126a.  Counterclaim (Dkt. 59).  However,

LCRC agreed to voluntarily dismiss its cost recovery claims under both CERCLA and NREPA. Def. Resp. at 8 (Dkt. 101). With leave of the Court, 1/22/20 Order (Dkt. 117), LCRC filed an amended counter-complaint asserting counterclaims against Gould for (1) contribution under CERCLA and (2) contribution under NREPA, Am. Counter-Compl. (Dkt. 118).

Gould has now filed a motion for partial summary judgment with respect to LCRC's liability, arguing that the Court previously determined that Gould has established a prima facie case for cost recovery under CERCLA, a strict liability statute. Meanwhile, LCRC has filed a motion for summary judgment seeking dismissal of Gould's CERCLA cost recovery claim, arguing that it is exempted from liability under two statutory affirmative defenses.[1]

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[1] Gould also sought summary judgment in its favor with respect to LCRC's cost recovery counterclaims under CERCLA and NREPA, while LCRC sought summary judgment in its favor with respect to Gould's NREPA contribution claim and its CERCLA cost recovery counterclaim. As described above, however, each of these claims has been voluntarily dismissed.

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## III. DISCUSSION

### A. Gould's Motion for Partial Summary Judgment

Gould contends that it is entitled to partial summary judgment regarding LCRC's liability, as the Court previously held that Gould has established a prima facie case of cost recovery under CERCLA. Pl. Mot. at 8. Because CERCLA is a strict liability statute that imposes liability regardless of causation or fault, United States v. Puerto Rico Indus. Rev. Co., 287 F. Supp. 3d 133, 141, 144 (D.P.R. 2017), Gould urges the Court to enter summary judgment with respect to LCRC's liability.

Gould is mistaken in its argument, as the Court has not held that Gould established a prima facie case as a matter of law. Rather, the Court found that Gould had presented sufficient evidence supporting a prima facie case, such that summary judgment could not be awarded against it. In an opinion denying LCRC's motion for summary judgment in the prior action, the Court noted that

to establish a prima facie case for cost recovery under CERCLA, a plaintiff must demonstrate the following elements:

> (1) a polluting site is a 'facility' within the statute's definition; (2) the facility released or threatened to release a hazardous substance; (3) the release caused the plaintiff to incur necessary costs of response; and (4) the defendant falls within one of four categories of potentially responsible parties.

Gould, 2012 WL 5817937, at *7 (quoting Village of Milford v. K–H Holding Corp., 390 F.3d 926, 933 (6th Cir. 2004)). When the Court rendered its decision, there was no dispute regarding the first or fourth elements.[2] Id. Rather, LCRC disputed the second and third elements, arguing that Gould could not demonstrate that a "release" occurred on the LCRC Property. Specifically, LCRC argued that the evidence did not support a finding that any of the TCE contamination originated from the LCRC Property or that LCRC was at fault for a release. Id.

With respect to the second element, the Court agreed with Gould that "it has met its prima facie burden of establishing that a release has occurred on LCRC's property." Id. at *8. The Court reasoned that "the very presence of TCE on LCRC's property, which is undisputed, illustrates that a release of that substance has occurred because the presence of TCE in the soils and/or groundwater under LCRC's property indicates a 'leaching' of that substance." Id. The Court further rejected LCRC's position that Gould was required to demonstrate fault or that the release originated from the LCRC Property in order to establish a prima facie case. Id.

With respect to the third element, the Court distinguished the present case from Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1069-1070 (6th Cir. 1999), in which the plaintiffs failed to proffer reliable scientific evidence establishing that a release on the

---

[2] LCRC continues to admit both that the LCRC Property has been designated a "facility" and that LCRC is a "covered person" within the meaning of 42 U.S.C. § 9607(a). Def. Mot. at 9-10 (Dkt. 86-1).

defendant's property contributed to contamination at the location where the plaintiffs had incurred response costs. In the present case, by contrast, the Court held that "it is undisputed that Gould has incurred, and will continue to incur, costs <u>arguably</u> responsive to the presence of TCE on LCRC's property, given that it is undisputed that there is a co-mingled plume of contamination migrating northeast of the properties . . . ." <u>Gould</u>, 2012 WL 5817937, at *8 (emphasis added). Although the Court acknowledged that the evidence was consistent with the possibility that Gould incurred response costs attributable to a release on the LCRC Property, it did not hold that this element was established as a matter of law. Gould, therefore, has not established a prima facie case as a matter of law, as there remains a question of fact with respect to whether the release on the LCRC Property caused Gould to incur response costs.

Accordingly, Gould is not entitled to summary judgment on its CERCLA cost recovery claim.

**B. LCRC's Motion for Summary Judgment**

LCRC asserts that it is entitled to summary judgment with respect to Gould's CERCLA cost recovery claim because it is shielded from liability under two statutory affirmative defenses: (1) the "innocent landowner" defense under 42 U.S.C. § 9607(b), and (2) the "contiguous landowner" defense under 42 U.S.C. § 9607(q). Def. Mot. at 10, 19.

**1. Innocent Landowner Defense**

As a preliminary matter, Gould contends that LCRC is barred from asserting the innocent landowner defense because it was not raised in the joint final pretrial order ("JFPO") in the prior action and because the Court has previously precluded LCRC from raising it. Pl. Resp. at 14-17 (Dkt. 100).

Gould is correct that LCRC failed to assert the innocent landowner defense in the JFPO in the prior action. See generally JFPO at 14-24, Gould Electronics, Inc. v. Livingston Cty. Rd. Comm'n (2012) (No. 09-cv-12633), ECF No. 147. Permitting LCRC to advance the defense would require the Court to evaluate whether the TCE contamination was caused by one or both of the parties and whether LCRC exercised due care with respect to the contamination—factors that are part of the equitable "Gore factors" relevant to LCRC's contribution counterclaim under CERCLA. See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994).[3] Inclusion of the defense in the present litigation, therefore, would not prejudice Gould because it would not introduce new issues or involve new evidence.

Further, the Court stated in a previous opinion that "the applicability of the innocent landowner defense is not currently at issue, as LCRC has not invoked the defense or discussed its applicability." Gould, 2012 WL 5817937, at *7. In so stating, the Court did not foreclose LCRC from raising the innocent landowner defense. Rather, the Court held that the defense was simply not at issue because LCRC had not raised it in its motion for summary judgment. Accordingly, the Court will consider the merits of the innocent landowner defense.

---

[3] The "Gore factors" were originally part of an amendment to the 1980 House Superfund Bill. Then "Congressman Albert Gore proposed the criteria as a moderate approach to joint and several liability, and the six criteria are often referred to as the 'Gore Factors.'" Envtl. Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508 (7th Cir. 1992). The six factors are: "(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment." Kerr-McGee, 14 F.3d at 326 n.4.

Under the innocent landowner defense, 42 U.S.C. § 9607(b)(3), an otherwise liable defendant is exempt from CERCLA liability if it can establish by a preponderance of the evidence "(1) that another party was the 'sole cause' of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; and (3) that the defendant exercised due care [with respect to the hazardous substance concerned] and guarded against the foreseeable acts or omissions of the responsible party." PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 179 (4th Cir. 2013). Gould contests LCRC's ability to demonstrate both that Gould was solely responsible for the release of TCE and that LCRC exercised due care in preventing further contamination. Pl. Resp. at 18.

### a. Sole Cause

With respect to the causation element of the innocent landowner defense, LCRC contends that Gould is solely responsible for the release of TCE discovered on the Gould and LCRC Properties. Def. Mot. at 10. However, the evidence presented by both parties reveals there are questions of fact regarding whether LCRC contributed to the contamination.

In support of its position that Gould is solely responsible for the contamination, LCRC first relies upon letters issued by the Michigan Department of Environmental Quality ("MDEQ") terminating its investigation of the LCRC Property.[4] Id. at 11. On June 14, 2019, the MDEQ sent LCRC a letter stating that it "agrees with the LCRC that there is no indication that a release of chlorinated solvents . . . occurred, and no releases of chlorinated solvents into LCRC property site soils are demonstrated to be directly attributable to LCRC's historic operations." 6/14/17 Letter,

---

[4] The MDEQ is now known as the Michigan Department of Environment, Great Lakes & Energy ("EGLE").

Ex. T to Def. Mot. (Dkt. 96). The MDEQ then sent a follow-up letter clarifying that it was not requesting the performance of additional sampling or report submittals and that it had "no further regulatory interest in the origin of the TCE contamination on that property." 6/23/17 Letter, Ex. U to Def. Mot. (Dkt. 96-1).

LCRC contends that the Court should accord considerable deference to the MDEQ's decision regarding LCRC's CERCLA obligations, in accordance with Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Def. Mot. at 11. However, the letter dated June 14, 2019, states expressly that the decision reached by the MDEQ is not to be "construed as a liability determination for the chlorinated solvent contamination on the subject property." 6/14/17 Letter. And according to Susan Leeming, the former chief of MDEQ's Division of Remediation and Redevelopment, the MDEQ's decision was motivated by its prioritization of more pressing issues, and did not constitute a determination that LCRC was "off the hook." Leeming Dep. at 21-22, Ex. B to Def. Reply (Dkt. 105). Thus, the MDEQ's decision does not purport to find that LCRC has no environmental liability, and in any event is not binding on this Court.

LCRC also relies on the conclusions drawn by its expert, Constance Travers, in arguing that Gould is solely responsible for the TCE contamination. Def. Mot. at 12-15. According to Travers, who reviewed LCRC Property site records, employee depositions, and soil and groundwater testing data, Gould's waste dumping practices were the only source of TCE contamination in soils and groundwater. Travers Report at 5, Ex. J to Def. Mot. (Dkt. 89-3). According to the depositions of two former Gould employees, Ron Galarneau and Keith Richardson, it was common practice for Gould employees to dispose of waste fluids on the ground at the Gould Property. See Galarneau Dep. at 34, 38-44, Ex. C to Def. Mot. (Dkt. 88-2);

Richardson Dep. at 29-32, 37, 45-46, Ex. E to Def. Mot. (Dkt. 88-4). Galarneau and Richardson testified that these fluids were regularly disposed of on the portions of the Gould Property immediately adjacent to the LCRC Property and near the railroad tracks in the northeast corner of the Gould Property. Galarneau Dep. at 34, 41-43; Richardson Dep. at 29.

By contrast, based on her review of LCRC's site records describing product purchases, Travers opined that LCRC did not use or purchase TCE prior to 1985. Travers Report at 13. Between 1985 and 1986, LCRC's use of TCE on the LCRC Property was limited to a maximum of seventeen asphalt tests. Id. at 13-14. Based on the testimony of Frederick Marr, an LCRC engineering aide responsible for handling TCE during the asphalt testing, Travers determined that these seventeen tests combined would have required a total of eight to thirteen gallons of TCE. Id. at 14 (citing Marr Dep. at 13, Ex. 8 to Pl. Resp. (Dkt. 100-9)). In 1987, LCRC replaced TCE used in asphalt testing with BioAct, an alternative cleaning agent. Id.

Travers also stated that the testimony of LCRC employees who handled TCE during the asphalt testing "demonstrates that they were aware of the need to containerize and properly dispose of the TCE used in these tests." Id. at 19. Indeed, Marr testified that he would collect used TCE in a five-gallon bucket, which he then transferred to a 55-gallon drum. Marr Dep. at 12-13. He expressly denied ever disposing of TCE on the ground, or ever witnessing anyone else do so. Id. at 15-16.

Eric Little, an LCRC technical services supervisor, testified similarly regarding LCRC's TCE disposal practices, stating that he had no knowledge of anyone disposing of chemicals on-site. Little Dep. at 14, 19, Ex. 9 to Pl. Resp. (Dkt. 100-10). Little further confirmed that TCE was used for approximately two years until the Michigan Department of Transportation required that BioAct replace TCE. Id. at 11-12. Little testified that the 55-gallon drum in which LCRC

employees collected TCE was picked up by Safety-Kleen Systems, Inc.—LCRC's solvent provider—but that he did not know what happened to the contents of the drum afterwards. Id. at 14. As noted by Gould, however, Safety-Kleen's vice president of environmental health and safety testified that the company had no record of picking up TCE waste from LCRC. Ross Dep. at 7, 51-54, Ex. 10 to Pl. Resp. (Dkt. 100-11).

According to Travers, results of the subsurface investigations of the Gould and LCRC Properties demonstrate that the soil and groundwater contamination was caused solely by Gould's disposal of TCE. Travers Report at 5. Based on the soil testing performed on the Gould and LCRC Properties, Travers noted that "[t]he only portion of the LCRC property where TCE has been observed in soils is the northwestern corner of the LCRC property . . . adjacent to the Gould disposal area." Id. at 26. Likewise, the highest concentrations of TCE in groundwater have been located in the disposal area in the northeastern corner of the Gould Property. Id. at 52. Travers also opined that the concentrations of TCE in soil and groundwater are consistent with the flow of groundwater in both a northeastern direction toward Thompson Lake and in a southeastern direction toward the LCRC Property. Id. at 5.

In stark contrast to Travers's expert opinion, Gould's expert, Stanley Feenstra, opined that "it is probable that most of the TCE contamination found on the LCRC site originated from releases on the LCRC Site itself." Feenstra Report at 6, Ex. A to Def. Mot. (Dkt. 88). Based on Feenstra's review of LCRC expense records, he believes LCRC purchased large quantities of a chlorinated solvent during the 1950s and 1960s. Id. at 21. Because "TCE was supplanting carbon tetrachloride for degreasing applications during this era," Feenstra opined that it was probable that the carbon tetrachloride used at the LCRC Property would have been replaced by TCE. Id. at 22. Feenstra

also stated that it was probable that TCE was used for asphalt testing at the LCRC Property from approximately 1971 through the late 1980s. Id. at 23.

Feenstra stated that until approximately 1980, disposal of waste TCE on the ground was common practice. Id. at 25. He further noted that none of the deposition testimony by former LCRC employees contradicted the possibility that TCE was disposed of in this manner before the 1980s—and further, there were no records documenting off-site disposal. Id. Given the likelihood that TCE was used at LCRC from the 1950s through the 1980s and that no employee had definitive knowledge regarding TCE disposal practices during that time, Feenstra opined that it was "probable" that LCRC employees disposed of TCE by pouring it on the ground. Id. at 7.

Based on his analysis of the topography of the contaminated areas, the pattern of groundwater flow, and locations of high levels of TCE contamination of the LCRC Property, Feenstra opined that it was highly improbable that the TCE contamination discovered on the LCRC Property could have migrated from the Gould Property. Id. at 6. Instead, Feenstra identified an area of the LCRC Property he believes is "the most probable area of entry of DNAPL [dense nonaqueous phase liquid] TCE into the subsurface to account for the TCE contamination on the LCRC Site . . . ." Id. at 37. During his deposition, Feenstra admitted that the manner in which the TCE would have come to be located there would be a matter of speculation. Feenstra Dep. at 125, Ex. G to Def. Mot. (Dkt. 89). Although twenty-three soil borings were later performed in this area between 2012 and 2016, no TCE was discovered. Travers Report at 23-26. Feenstra admits this fact in his report but states that the testing was defective because samples were not collected from the appropriate depth, and because groundwater samples were not collected. Feenstra Report at 38. Accordingly, Feenstra maintains that the TCE contamination discovered on the LCRC Property originated from releases on the LCRC Property itself. Id. at 6.

LCRC contends that Feenstra's opinions cannot raise a material issue of fact, as they are premised on mere speculation. Def. Mot. at 18 (citing Kalamazoo River, 171 F.3d at 1072-1073 (affirming district court's holding that an expert opinion "based solely on speculation and possibility . . . . does not create a material issue of fact for trial . . . .")). But here, Feenstra opined—based on his analysis of the topography and groundwater elevation on the LCRC Property—that the groundwater in the areas where TCE concentrations are highest does not flow from the Gould Property onto the LCRC Property. Feenstra Report at 34. Thus, much of the contamination present on the LCRC Property cannot be attributed to migration from the Gould Property. Id. at 39.[5] Feenstra's conclusion that a release of TCE must have taken place on the LCRC Property is, therefore, supported by his analysis of objective data indicating a low likelihood that TCE migrated from the Gould Property onto the LCRC Property. Unlike Kalamazoo River, "'[t]he analytical gap between the evidence presented and the inferences to be drawn'" is not too wide. See 171 F.3d at 1073 (quoting Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1350 (6th Cir. 1992)).

Gould alternatively contends that the innocent landowner defense is unavailable to LCRC because it was responsible for releasing TCE on the LCRC Property when it performed a grading and construction project. Pl. Resp at 20-22. According to Travers, LCRC redistributed TCE-contaminated soils across a broader area of the northwestern portion of its property during the construction of a salt storage building in 1979. See Travers Report at 9-10. Caselaw has held that

---

[5] This opinion is consistent with that of MDEQ's geologist Dwight Cummings, who wrote in a 2012 request for geological review that there were three areas of TCE contamination on the LCRC Property that could not be accounted for by migration. Cummings Dep. at 7-10, Ex. 15 to Pl. Resp. (Dkt. 100-16); see also 11/26/12 Request for Geological Review at 7, Ex. 13 to Pl. Resp. (Dkt. 100-14). Cummings was deposed more recently, in October 2019, and he stated he had no knowledge if these statements remained accurate. Cummings Dep. at 10. However, he stated that LCRC had not completed its investigation of TCE. Id. at 21.

excavation activities can result in a "new release" of contaminants contained in soil. In <u>Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.</u>, 791 F. Supp. 2d 431, 494 (D.S.C. 2011), the court held that the innocent landowner defense did not apply because the defendants caused new releases of hazardous substances when they extended water and sewer lines through contaminated soil. Similarly, in <u>United States v. Honeywell Int'l, Inc.</u>, 542 F. Supp. 2d 1188, 1200 (E.D. Cal. 2008), the court held that the innocent landowner defense was inapplicable because the defendant's excavation of its property agitated the soil, thereby releasing contaminants.

The term "release" is defined to mean: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). Courts uniformly interpret the word "release" broadly to avoid frustrating CERCLA's legislative purpose of protecting and preserving public health and the environment. <u>See</u> <u>In re Joshua Hill, Inc.</u>, 294 F.3d 482, 489 (3d Cir. 2002) (collecting cases interpreting "release" broadly). While the redistribution of contaminants across a previously uncontaminated area would fit within the broad definition of a "release," the evidence before the Court does not clearly demonstrate the physical scope of LCRC's grading activities or whether the area surrounding the salt storage building was uncontaminated before LCRC began its grading. Thus, a question of fact remains regarding the effects of LCRC's excavation in that area.

Given the substantial conflicts in the evidence discussed above—including the expert reports and testimony from the parties' employees—there are questions of fact regarding LCRC's historical use and disposal of TCE, the sources of the TCE contamination in light of the soil and groundwater analyses, and whether LCRC caused a release of TCE. Accordingly, the Court cannot determine as a matter of law that Gould is solely responsible for the release of TCE.

### b.  Due Care

With respect to the requirement that an innocent landowner exercise "due case with respect to the hazardous substance concerned," 42 U.S.C. § 9607(b)(3), LCRC maintains that it has conducted extensive investigation of the TCE contamination over the course of many years.  Def. Mot. at 5-6.  According to Travers, LCRC's consultant began conducting subsurface investigations of soils and groundwater on the LCRC Property in the 1990s.  Travers Report at 49.  Although the work was primarily associated with removal of underground storage tanks that did not contain TCE, monitoring wells were installed throughout the LCRC Property, and soil and groundwater were tested for TCE.  Id.  Although TCE was not detected in any of the soil samples, it was detected in one groundwater sample from the northwest corner of the LCRC Property, near the plume of contamination emanating from the Gould Property.  Id.

LCRC continued its collection and analysis of soil and groundwater samples between 2003 and 2015.  Id. at 52-54.  In 2012, LCRC's consultant advanced eight boreholes in the possible area of entry on the LCRC Property identified by Feenstra.  Id. at 23.  Between 2012 and 2016, LCRC worked closely with the MDEQ to advance twenty-three additional boreholes in the purported source location.  Id. at 26.  A letter from the MDEQ dated January 8, 2015, confirms that LCRC completed soil borings, soil sampling, and vertical aquifer sampling in 2012 and 2013, and examined existing monitoring wells and installed a temporary well on the LCRC Property in 2014.  1/8/15 Letter at 1-2, Ex. 21 to Pl. Resp. (Dkt. 100-22).

Gould, however, contends that LCRC cannot demonstrate that it exercised due care because it failed to take reasonable steps to prevent the continued release of TCE.  Pl. Resp. at 22-23.  In support of its position, Gould submits various letters from the MDEQ noting the inadequacy of LCRC's investigation and remediation efforts.  Id.  In a letter dated February 8, 2012, the MDEQ

noted that since the MDEQ issued a formal notice in 2007 stating that the LCRC Property was contaminated, "[t]he LCRC has not conducted sufficient site investigation with regard to evaluating its known and suspected releases of chlorinated solvents from its historic work practices." 2/8/12 Letter at 2, 5, Ex. 20 to Pl. Resp. at 2, 5 (Dkt. 100-21).

In a letter dated January 8, 2015, the MDEQ noted that while LCRC completed a portion of the response activities requested by the MDEQ, it had not performed all activities necessary to discharge its obligations under NREPA. 1/8/15 Letter at 1, 3. A September 29, 2015, activity report documents LCRC's reluctance to comply with the MDEQ's request to install a monitoring well, although LCRC had not installed a single monitoring well on the LCRC Property since the 1980s. Activity Report at 1-2, Ex. 22 to Pl. Resp. (Dkt. 100-23). And on September 7, 2016, the MDEQ denied LCRC's proposed response activity plan because "[t]hey do not propose to complete meaningful response activities to address releases of hazardous substances the LCRC are and may be responsible for and do not provide schedules for site investigation work." 9/7/16 Letter, Ex. 23 to Pl. Resp. (Dkt. 100-24).

Moreover, Gould contends that LCRC refused to provide Gould with access to the LCRC Property to conduct remediation. Pl. Resp. at 23. Consequently, Gould was required to defer response activities for months while it filed a motion to compel with the Court. See generally Pl. Mot. to Compel (Dkt. 75). In response to the motion to compel, however, LCRC clearly stated that it did not oppose the proposed testing for the purpose of developing and executing a remedial action plan, but rather that it objected to the use of belated testing for purposes of the litigation. Def. Resp. to Mot. to Compel at 3, 6 (Dkt. 78). There is no other indication in the record that LCRC refused to provide access to the LCRC Property for remediation.

Taken as a whole, while some of the evidence suggests that LCRC has made reasonably diligent efforts since the 1990s to investigate the TCE contamination, other evidence demonstrates that LCRC did not fulfill certain obligations as promptly or as thoroughly as the MDEQ requested. In light of this conflicting evidence, whether LCRC exercised due care with respect to the TCE contamination will require resolution of several questions of fact.

Given the factual questions presented regarding whether Gould was the sole cause of the contamination and whether LCRC exercised due care with respect to the contamination, this Court cannot determine as a matter of law that LCRC is exempted from liability for CERCLA cost recovery under the innocent landowner defense.

### 2. Contiguous Landowner Defense

LCRC alternatively contends that it is entitled to summary judgment with respect to Gould's CERCLA cost recovery claim because it is shielded from liability under the contiguous landowner defense. Def. Mot. at 19-22. Under 42 U.S.C. § 9607(q), a property owner is not liable under § 9607(a) if he "owns real property that is contiguous to . . . and that is or may be contaminated by a release or threatened release of a hazardous substance from, real property that is not owned by that person," if certain rigorous qualifications are met.

One of the qualifications a defendant must establish to successfully invoke the contiguous landowner defense is that, at the time at which the defendant acquired the contaminated property, it (1) "conducted all appropriate inquiry . . . with respect to the property," and (2) "did not know or have reason to know that the property was or could be contaminated by a release or threatened release of one or more hazardous substances from other real property not owned or operated by the person." 42 U.S.C. § 9607(q)(1)(A)(viii).

According to Gould, LCRC cannot establish this qualification because it was aware of the TCE contamination when it purchased the LCRC Property. Pl. Resp. at 24. Although LCRC owned and operated from the LCRC Property since the 1930s, it sold the property to Livingston County in 2002. Property Purchase Agreement, Ex. 28 to Pl. Resp. (Dkt. 100-29). In 2007, LCRC received formal notice from the MDEQ that the LCRC Property was contaminated with TCE. Facility Notification Letter, Ex. 29 to Pl. Resp. (Dkt. 100-30). LCRC later purchased the LCRC Property back from Livingston County in 2011. Agreement to Purchase Real Estate, Ex. 30 to Pl. Resp. (Dkt. 100-31). According to the purchase agreement, the purchase price was "equal to the sums expended in attorney's fees and costs" by Livingston County in litigating the prior action. Id. Thus, it is undisputed that LCRC knew at the time it reacquired the LCRC Property from Livingston County that the property was contaminated with TCE.

LCRC contends that this element of the contiguous landowner defense is inapplicable because LCRC owned the LCRC Property before the TCE contamination occurred. Def. Mot. at 21-22. However, LCRC does not explain the legal significance of this fact, let alone provide any authority in support of its argument. Because the evidence clearly establishes that LCRC had actual knowledge of the TCE contamination at the time it repurchased the LCRC Property from Livingston County, it cannot establish this necessary element of the contiguous landowner defense.

Because there are questions of fact regarding the application of the innocent landowner defense and because LCRC cannot establish a necessary element of the contiguous landowner defense, LCRC is not entitled to summary judgment with respect to Gould's CERCLA cost recovery claim.

## IV.  CONCLUSION

For the reasons stated above, Gould's motion for partial summary judgment (Dkt. 90) and

LCRC's motion for summary judgment (Dkt. 90) are both denied.

SO ORDERED.

Dated:  February 18, 2020                          s/Mark A. Goldsmith
        Detroit, Michigan                          MARK A. GOLDSMITH
                                                   United States District Judge